SWIGGETT, DEMANDANTE Y APELADO, *v.* COLMORE ET AL., DEMANDADOS Y APELANTES.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección Primera, en pleito sobre daños y perjuicios

No. 2391.—Resuelto en marzo 7, 1922.

MANDATO—PROHIBICIÓN DE COMPRAR EL MANDATARIO LOS BIENES DEL MANDANTE.— La siguiente doctrina, establecida en *Silva Hnos. & Cía.* v. *Registrador,* 28 D. P. R. 177: "aunque el mandatario no puede adquirir los bienes de su mandante, como esta prohibición es de interpretación restrictiva, si es el mismo mandante el que se los vende, se entiende de hecho revocado el mandato e inaplicable tal prohibición," no es absoluta. Juega un papel decisivo la conducta del mandatario y si puede concluirse que se aprovechó de los datos obtenidos vigente la agencia e hizo cesar ésta para lucrarse personalmente basado en tales datos, sin dar a su mandante el beneficio de ellos, su actuación no debe ser reconocida por las cortes como legítima fuente de derechos.

Los hechos están expresados en la opinión.

Abogado del apelado: *Sr. F. H. Dexter.*

Abogado de los apelantes: *Sr. J. R. F. Savage.*

EL JUEZ PRESIDENTE SR. DEL TORO, emitió la opinión del tribunal.

Basándose en la existencia de cierta promesa de venta dejada de cumplir por el demandado, el demandante le reclama en este pleito $2,770 en concepto de daños y perjuicios. La parte demandada admite la existencia de la promesa pero alega su nulidad y pide que se le absuelva de la

demanda, con costas al demandante. Resueltas varias cuestiones de derecho previamente suscitadas, fué el pleito a juicio y la corte de distrito finalmente dictó sentencia en contra del demandado. Después de hacer referencia a las alegaciones de las partes, la opinión emitida por el juez termina así:

"Se celebró el juicio, practicándose la prueba que fué documental y testifical, de cuyo examen a juicio de la corte resulta que en un principio, el demandante como amigo de los demandados, ofreció su concurso para ayudar a los demandados, a la venta de la finca.

"Que a los vendedores les interesa que la venta se hiciera al contado y en un solo lote.

"Que el día 24 de septiembre, el demandado le entregó al demandante la opción o promesa de venta bajo la creencia de que el demandante podría ganarse mil o dos mil dollars.

"Que estando en todo su vigor el contrato, y cuando el demandante ya había obtenido ofertas de la finca por la suma de $13,870, parte al contado y parte a plazo, y que le reportaban un beneficio de $2,770, los demandados le revocaron la opción.

"Entendemos que no hubo el error a que hace referencia nuestro Código Civil, en los artículos 1232 y 1233, y que las relaciones de amistad entre el demandante y el demandado, no son causas para invalidar el contrato; como tampoco lo son las que pueden existir consideradas esas relaciones bajo el carácter de mandante y mandatario.

" 'Aunque el mandatario no puede adquirir los bienes de su mandante como esta prohibición fué de interpretación restrictiva si es el mismo mandante el que se los vende, se entiende de hecho revocado el mandato, e inaplicable tal prohibición. Silva Hnos. & Cía. v. El Registrador de San Juan, Sección Primera.—Tribunal Supremo de Puerto Rico, 12 de marzo de 1920.'

"Por lo tanto entendemos que debemos declarar, y declaramos con lugar la demanda y en su consecuencia condenamos a los demandados a pagar al demandante la suma de $2,770, costas y honorarios de abogado."

La parte apelante señala la comisión de once errores que argumenta luego amplia y cuidadosamente. El apelado contesta de modo amplio y cuidadoso también todo aquello que

a su juicio es esencial.   Dada la opinión que del caso hemos formado, prescindiremos de considerar por escrito los cinco primeros errores que se refieren a "la excepción previa" y a "las resoluciones durante el juicio" y entraremos de lleno en el análisis y resolución de los restantes agrupados en el alegato bajo el título de "errores cometidos en la sentencia."

Un estudio conjunto de las alegaciones y las pruebas permite afirmar lo que sigue: La demandada, "The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States" era dueña de una parcela de terreno radicada en el barrio de Bayola de Santurce, San Juan, P. R., de 7,325 metros cuadrados de superficie, cuyo título figuraba en el registro de la propiedad a nombre del otro demandado Charles B. Colmore, Obispo de la dicha Iglesia Protestante Episcopal.

En mayo de 1918, según declaró el propio demandante, se encontró en Nueva York en la oficina de las Misiones del Hogar con el Dr. Gray quien inquirió su opinión sobre la compra hecha por el Obispo Colmore del pedazo de terreno de que se trata.   El demandante dijo que pensaba que el Obispo no había hecho una mala compra.   El doctor le interrogó si creía que trece mil dólares sería un buen precio para venderla y el demandante le contestó que nunca se sabía el precio de una cosa hasta que se vendía.   Entonces el doctor le preguntó si estaría dispuesto a ayudar al Obispo a vender la propiedad "y yo le respondí"—dice el propio demandante —"que estaba muy contento en ayudarle y hacer cualquier cosa que pudiera en beneficio de la iglesia como siempre lo había hecho."

Regresó el demandante a Puerto Rico.   El Obispo y él celebraron varias conferencias y se acordó poner sobre los propios terrenos un anuncio de la venta expresándose en el mismo que darían informes el Sr. Colmore o Swiggett Brothers.

Transcurrió algún tiempo.   El agente de negocios José

Nieves visitó al Obispo Colmore y ofreció vender la finca dividida en solares a razón de dos dólares cincuenta centavos el metro cuadrado libre de gastos y comisiones. El 21 de septiembre de 1918 Sebastián Moll habló con el demandante diciendo que estaba interesado en la compra de la finca y pidió precio. Contestó el demandante que Moll sabía el valor de las propiedades en el Condado y que le hiciera la oferta por escrito. Moll hizo en efecto la oferta escrita por $13,870. Lleva fecha 21 de septiembre de 1918 y, según Moll, fué entregada ''dos o tres o cuatro días después.'' Según el demandante lo fué el 25 de septiembre por la mañana.

El 24 de septiembre por la tarde el demandante fué a la casa del demandado Colmore y allí se firmó el siguiente documento:

''*San Juan, P. R., Sept. 24th, 1918.—It is hereby agreed that I, Chas. B. Colmore, on or before November 1st. 1918, will sign the deed to the property situated in the Condado next to the Presbyterian Hospital and bought by me from George D. Graves in favor of R. S. Swiggett, in consideration of the price of Eleven Thousand One Hundred Dollars.*''

Difiere la prueba de ambas partes en cuanto a las circunstancias que precedieron a la firma del documento y que llevaron al Obispo a decidirse en el sentido expresado en el mismo. La tendencia de la prueba del demandante es a demostrar que él se presentó en la tarde del 24 desprovisto de su carácter de consejero o agente a tratar del asunto como de un simple negocio expresando que aspiraba a ganarse unos mil o dos mil dólares y que con pleno conocimiento de todo ello actuó el demandado Colmore y firmó la promesa. Por el contrario la prueba de la parte demandada tiende a presentar al Obispo como un hombre sin experiencia en los negocios, vacilante en cuanto a la resolución que debía adoptar, deseoso de hacer lo mejor que pudiera hacerse en beneficio de su iglesia y enteramente confiado en la amistad y en los conocimientos del demandante y que si al fin se decidió

a firmar el documento se debió a que el demandante le expresó que la venta de la finca en solares sería tardía corriéndose el riesgo de vender los mejores y quedarse con los peores, que no había comprador, y que lo mejor para la iglesia sería reintegrarse del dinero que había invertido lo que conseguiría exactamente con los once mil cien dólares que el demandante ofrecía pagar por las tierras. Admite dicha prueba que el demandante habló de ganarse mil o dos mil dólares pero sostiene que dijo que eso sería dentro de uno o dos años.

Una vez que el documento fué firmado, el demandante se retiró a su casa y en seguida fué llamado por teléfono por el Obispo quien le dijo que quería pensar más, que había procedido muy de prisa. El demandante se incomodó y llamó un poco después al Obispo diciéndole que iba a remitirle con un muchacho el documento. El Obispo le contestó que lo guardara y que a la mañana siguiente hablarían. El propio demandante en su declaración narra lo ocurrido en el siguiente día así:

"El vino a casa por la mañana y me dijo que él no había decidido nada sobre el asunto, que él lo que necesitaba era hablar conmigo otra vez. Le dije que estaba bien, que él lo podía hacer, después de quince minutos que yo tomaría el trolley, porque si yo voy a San Juan y vendo este pedazo de terreno usted no me causará otra cosa sino trastornos. Esta conversación tuvo lugar en mi casa a las nueve de la mañana, al día siguiente al que se firmó el contrato. Yo le dije después cuando él vino a mi casa aquella mañana, como le había dicho el día anterior, que no estaba por más tiempo en la condición de un consejero porque yo estaba ahora como un comprador. Estaba en mi tienda dos horas y Mr. Moll me hizo una oferta por la propiedad de $13,870. Hizo la oferta por escrito. Yo le dije que no podía aceptar esa oferta, que si él podía ofrecer más entonces yo me podía entender con él; entonces fuimos a La Mallorquina y cuando íbamos caminando hacia allá nos encontramos con Mr. Prieto quien fué donde el Obispo y le dijo * * *. Esto tuvo lugar el 25 de septiembre de 1918. El Obispo vino a verme a mí a las cuatro de la tarde de aquel día, y me preguntó si yo le iba

a obligar acerca del contrato que él me había firmado la tarde anterior, y yo le pregunté que qué era lo que él decía, y me contestó que el Sr. Prieto había vendido la propiedad por $17,500, y yo le dije que si esto era verdad no lo obligaría a él a la promesa entre la suma de mi contrato y esta suma, entonces él insistió en que yo le devolviera el contrato y yo le dije que si él me devolvía un cheque por $2,770 cual es la diferencia entre el contrato que él me hizo y la suma en la cual yo pude haber vendido la propiedad el mismo día a Mr. Moll. Estoy dispuesto a renunciar a la diferencia que hay entre el precio que yo pude vender a Mr. Moll y el que dió el otro comprador.''

El demandado Colmore lo describe así:

''Me fuí a su casa por la mañana y hablé sobre la misma cosa, casi lo mismo que habíamos hablado por la tarde antes. Yo fuí a casa del demandante como a las ocho. El demandante estaba vistiéndose. Lo que él me dijo no era exactamente lo mismo que lo que me dijo el día anterior. Hubo alguna variación. En aquella mañana recuerdo que me dijo que estaba ahora en la posición de comprador en lugar de consejero. No puedo decir exactamente que era la primera vez que había dicho eso pero era la primera vez que era muy claro eso. Ese día recuerdo que dijo que en su conversación con el Dr. Gray en New York, el Dr. Gray había dicho que era mal negocio el comprar eso y que ellos querían sacar su dinero, que esa era la oportunidad de hacerlo y creía que era más conveniente para mí hacer eso. En estas conversaciones creo que era la idea expresada que no era posible venderla en solares. No recuerdo bien sus palabras de esta cosa; la idea que tengo en mente es que era su consejo de no tratar de venderla en solares porque no se presentó la oportunidad de venderla así. Esa segunda conversación fué el día 25 por la mañana. Terminamos esa conversación con la determinación de continuar con la opción. El Sr. Swiggett no me dijo que yo tenía que determinarlo dentro de quince minutos. Ese día como a las cuatro de la tarde se presentó en mi casa el Sr. José Nieves Prieto. Motivado por la visita de Nieves Prieto me fuí seguida a la tienda del Sr. Swiggett. Yo le pregunté al Sr. Swiggett si él sabía lo que había dicho el Sr. José Nieves Prieto sobre lo que él podía hacer en vender el terreno. Yo le dije al Sr. Swiggett que mi información del Sr. Nieves Prieto era que él había hecho un plano para dividir el terreno y tenía compradores para el terreno

en lo que él había convenido entregar $2.50 metro limpios. Me ofreció eso una vez, la primera vez que hablé con él. El día 25 fué la primera vez que yo vi al Sr. Nieves Prieto después de la conversación que tuvo el Sr. Nieves Prieto con el Sr. Swiggett en mi presencia en la tienda del Sr. Swiggett. Yo fuí en seguida al Sr. Swiggett el día 25 por la tarde. Mr. Swiggett estaba en su tienda. Cuando yo le hice esa manifestación el Sr. Swiggett me preguntó: ¿Qué quiere hacer? Le contesté que yo solamente quiero saber si usted va a obligarme en continuar con esta opción que yo le di la noche pasada. El Sr. Swiggett pensó por un momento y luego me dijo: no lo obligaría a usted a nada. En seguida cuando me dijo eso un amigo vino en su automóvil y el Sr. Swiggett me dijo: tengo compromiso con ese amigo, tengo que salir en seguida; yo hablo con usted más después.''

Hay dos momentos de importancia decisiva en este caso. Aquél en que se firmó la promesa de venta y aquél en que el demandado Colmore en la tarde del 25 de septiembre estuvo en la casa comercial del demandante.

La corte de distrito no hace en su opinión un análisis minucioso de la prueba, pero al dar validez a la promesa de venta decide implícitamente el conflicto de la misma en cuanto a la conducta del demandante y en cuanto a la liberación por parte del demandante al demandado del compromiso contraído, en contra del demandado. Siendo esto así, tendría que demostrarse que dicha corte actuó movida por pasión, prejuicio o parcialidad, o que cometió error manifiesto, para que su decisión pudiera ser revocada.

Estamos convencidos de que la corte no actuó a virtud de pasión, prejuicio o parcialidad, pero a nuestro juicio erró de modo manifiesto al apreciar la prueba.

Citó la corte nuestra jurisprudencia establecida en el caso de *Silva Hnos. y Cía.* v. *El Registrador,* 28 D. P. R. 177, esto es, que ''aunque el mandatario no puede adquirir los bienes de su mandante como esta prohibición es de interpretación restrictiva, si es el mismo mandante el que se los

vende, se entiende de hecho revocado el mandato, e inaplicable tal prohibición.''

Quizá los términos absolutos en que está expuesta la doctrina contribuyeron al error de la corte sentenciadora. Tal vez el juez pensó que resultando como resultaba aquí que el mismo demandante fué el que directamente vendió al mandatario, la prohibición no era aplicable sin más consideraciones.

La doctrina no es absoluta. Juega un papel decisivo la conducta del mandatario y si puede concluirse que se aprovechó de los datos obtenidos vigente la agencia e hizo cesar ésta para lucrarse personalmente basado en tales datos, su actuación no debe ser reconocida por las cortes como legítima fuente de derecho.

Son muchas las decisiones de los tribunales americanos sobre este punto. Nos limitaremos a transcribir resúmenes de Cyc. de aquéllas que consideramos más pertinentes para no alargar demasiado esta opinión:

"De acuerdo con la regla anterior, la buena fe y la lealtad a los intereses del mandante exigen que un mandatario no asuma, excepto con entero conocimiento y consentimiento de su mandante, obligación alguna ni efectúe ninguna transacción con respecto a la materia objeto del mandato en que él tenga o represente intereses contrarios a los de su mandante. Si lo hace así, el mandante, al adquirir pleno conocimiento de los hechos, puede repudiar la transacción, sin consideración al hecho de si el agente actuó de mala fe, o de si la transacción causó pérdida al mandante; o el mandante puede aceptar la transacción y obligar al mandatario a responder de cualesquiera ganancias en ella efectuadas. Nada puede anular este derecho del mandante excepto su propia confirmación después de tener pleno conocimiento de todos los hechos, y no importa que el agente fuera un mero agente voluntario, o que estuviera actuando gratuitamente. Ni es esta regla afectada por una costumbre o uso en contrario, del cual el mandante no tenía aviso, efectivo o interpretativo.'' 31 Cyc. 1432-33.

"Como regla general a un mandatario no le está permitido efectuar transacción alguna con su mandante, representándose a sí mismo,

con respecto a la materia objeto del mandato, a menos que actúe con entera buena fe o sin indebida influencia o imposición, y haga una completa exposición de todos los hechos y circunstancias que rodean la transacción. Sin embargo, como esta regla existe para proteger al mandante, no tiene aplicación a casos en que el mandatario abierta y justamente negocia con el mandante, pues en tales casos el mandatario tiene tanto derecho a negociar con el mandante como cualquiera otro. No obstante, debido a posibles abusos de la confianza depositada en el mandatario, y a su influencia imperativa sobre el mandante, y al conflicto natural entre el deber y el interés en negociaciones entre el mandante y el mandatario, la ley ve con suspicacia y escudriña estrechamente todas las negociaciones entre ellos sobre la materia objeto del mandato, para cerciorarse de que el mandatario ha actuado con la mayor buena fe y ecuanimidad, y que ha dado al mandante el beneficio de todos sus conocimientos y habilidad, y si aparece que el mandatario ha sido culpable de alguna ocultación o parcialidad o si ha tomado alguna ventaja de sus relaciones confidenciales, la transacción no será dejada subsistente. No constituye excepción a esta regla el hecho de que el mandatario no tenía facultad para contratar a nombre de su principal con respecto a la materia y sólo fué empleado para investigar o para buscar una persona con quien el mandante pudiera negociar." 31 Cyc. 1442-43.

"La lealtad a los intereses de su mandante también exige que un mandatario haga conocer a su mandante cualquier hecho material respecto a la materia objeto de su mandato que llegue a su conocimiento o surja en su memoria durante la vigencia de su mandato; y si deja de hacerlo así es responsable por daños a su mandante por cualquier perjuicio incurrido o pérdida sufrida como resultado de tal omisión aunque se ha resuelto que por virtud de esa omisión el mandatario toma para sí la obligación o reclamación, sobre la cual es responsable a su mandante tanto como el tercero lo hubiera sido." 31 Cyc. 1450-51.

En el curso de la opinión de esta corte emitida en el caso de *Ledesma et al.* v. *Agrait et al.,* 19 D. P. R. 566, 572, en el que estaba envuelta la cuestión de una venta hecha por un mandante a su mandatario, se dijo:

"En vista de estos hechos no dudamos que Ledesma tuvo todo el conocimiento esencial que tenía su mandatario y que el primero rati-

ficó la venta si era necesario que lo hiciera dada la naturaleza prohibida de la transacción.''

Si partimos de la base de las declaraciones del demandado Colmore, de su esposa, y de Charles Hartzell, es evidente que cuando el demandante, en 24 de septiembre de 1918, quiso convertirse de agente o consejero en comprador, no manifestó al demandado Colmore todo lo que sabía, como era su deber. Y a esa misma conclusión puede llegarse aún aceptando la propia declaración del demandante analizándola en su conjunto. En 21 de septiembre ya el demandante, actuando como agente, recibió la proposición de Moll. En su carácter de agente contestó a Moll que formulara por escrito su proposición con expresión del precio que estaba dispuesto a pagar. Si el demandante el 24 de septiembre hubiera comunicado lo ocurrido a Colmore, le hubiera dado la oportunidad de investigar la proposición, y como Moll la tenía escrita desde el propio 21, al conocerla Colmore y al enterarse por ella que ofrecía pagar $2,770 más que el demandante, ¿no es razonable creer que hubiera dejado de firmar la promesa de venta que firmó y en la cual basa su reclamación el demandante? ¿Cómo vamos a reconocer al demandante derechos que emanan de su silencio en el momento en que debió haber hablado claramente? Es la proposición de Moll si no ultimada por lo menos comenzada y no puesta debidamente en conocimiento del demandado mientras el demandante era su agente, la que sirve al demandante para reclamar la ganancia dejada de obtener.

Creemos, a virtud de un examen de toda la prueba, que cuando el demandado Colmore firmó la promesa de venta de que se trata, lo hizo bajo la impresión, obtenida por las manifestaciones del demandante, que la proposición de éste era la mejor que podía obtenerse para la iglesia en aquel momento; y que si el demandante podría lograr alguna ganancia, lo sería al cabo de uno o dos años y teniendo que

· tomar dinero a préstamo.   Y creemos además que el deman-
dante, el 24 de septiembre, no mencionó al demandado Col-
more el nombre de Moll ni la proposición que de él había
recibido actuando como agente suyo.

La idea de la ley es·consagrar las transacciones legítimas,
asegurar el debido cumplimiento de los contratos, premiar
el trabajo, la inteligencia, y el valor y la decisión que implica
muchas veces la asunción de riesgos, pero en manera alguna
ayudar a aquellos que en la consecución de sus propósitos
asumen actitudes contrarias a sus propios compromisos pre-
viamente contraídos.   El primero y principal deber del de-
mandante en este caso era para con los demandados.   Sólo
habiendo terminado por completo su misión para con ellos
y habiendo ellos recibido todo el beneficio de los informes ad-
quiridos y oportunidades presentadas, hubiera podido nacer
una relación nueva.   Quizá el demandante creyó que actuaba
correctamente.   Quizá pensó que bastaba decir al demandado
el 24 de septiembre que desde aquel momento cesaba como
consejero.   Pero hemos visto que de acuerdo con la ley y
la jurisprudencia eso no es bastante.   Se ha dicho que la
amistad y la confianza son una cosa y los negocios otra.   Es
cierto que las relaciones comerciales se inspiran principal-
mente en la obtención de una ganancia, pero las únicas ga-
nancias que una sociedad bien constituída puede reconocer,
y la nuestra lo está, son aquéllas que se basan en transac-
ciones justas, esto es, en que a cada parte se le ha recono-
cido lo que es suyo y aquí la oferta de Moll era en principio
del demandado y no del demandante.   Para que el deman-
dante hubiera podido fabricar sobre la oferta de Moll el edi-
ficio de su reclamación, debió haberla entregado primero a
su mandante y si éste la desechaba y con pleno conocimiento
de la situación se decidía a contratar con él, entonces el de-
mandante hubiera fabricado sobre roca y no sobre arena
como lo hizo en este caso.

Siendo como es esto así, procede revocar la sentencia ape-

lada sin que sea necesario que entremos en la consideración de la prueba relativa al segundo de los momentos que hemos calificado de decisivos en este pleito. Nos referimos a aquél en que según el demandado Colmore al él preguntar al demandante en la tarde del 25 de septiembre si lo iba a obligar a continuar con la opción, recibió una respuesta negativa sin condiciones, y en que, según el demandante lo ocurrido fué que él manifestó su conformidad en no obligar al cumplimiento del contrato siempre que se le pagara la ganancia. que él en aquel momento tenía obtenida, a saber: $2,770, a virtud de la oferta de Moll.

Procede declarar con lugar el recurso interpuesto, revocar la sentencia apelada y dictar otra desestimando la demanda, sin especial condenación de costas.

> *Revocada la sentencia apelada y desestimada*
> *la demanda sin especial condenación de cos-*
> *tas.*

Jueces concurrentes: Sres. Asociados Wolf, Aldrey y Hutchison.