Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lizbeth M. Dávila Nieves<br>    Peticionaria<br><br><br>                 v.<br><br><br>Luis Orlando Meléndez Marín<br>    Recurrido | Certiorari<br><br>2013 TSPR 12<br><br>187 DPR ____ |

Número del Caso: CC-2011-534

Fecha: 6 de febrero de 2013

Tribunal de Apelaciones:

        Región Judicial de Carolina

Abogada de la Parte Peticionaria:

        Lcda. Rosa Ward Cid

Abogadas de la Parte Recurrida:

        Lcda. Leticia Pabón Ortíz
        Lcda. Yamellis Marrero Figueroa

Materia: Derecho Apelativo – Revisión de la decisión del juzgador por haber mediado pasión, prejuicio o parcialidad en la apreciación de la prueba.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Lizbeth M. Dávila Nieves
        Peticionaria

                                              *Certiorari*

        v.                        CC-2011-534

Luis Orlando Meléndez Marín
        Recurrido


Opinión del Tribunal emitida por la Jueza Asociada señora FIOL MATTA


En San Juan, Puerto Rico, a 6 de febrero de 2013.

Una de las normas más conocidas en nuestro ordenamiento jurídico es que los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realizan los tribunales de instancia, a menos que se demuestre que el juzgador actuó movido por pasión, prejuicio o parcialidad o que incurrió en error manifiesto. Sin embargo, nuestra jurisprudencia, aunque menciona estos conceptos continuamente, se ha centrado en precisar las características del error manifiesto. Hoy tenemos ocasión de examinar la conducta y expresiones de un juez de instancia, en el contexto

de una causa de acción en daños por alegados actos de violencia doméstica, para determinar si, en efecto, evidencian pasión, prejuicio o parcialidad, dándole contenido de una vez a estos conceptos.

I

El 23 de febrero de 2008, la señora Lizbeth M. Dávila Nieves demandó a su excompañero Luis O. Meléndez Marín. Reclamó por los daños y perjuicios sufridos como consecuencia de supuestos actos de violencia doméstica por parte del señor Meléndez Marín, que incluían un patrón sostenido de maltrato físico y sicológico, así como actos específicos de violencia.[1] Asimismo, solicitó la liquidación de la comunidad de bienes existente entre ellos.

Según la demandante, en junio de 2001 comenzó una relación sentimental con el señor Meléndez Marín. Durante los primeros años de relación, la pareja convivió en la residencia de la madre del demandado y, en verano de 2005, empezaron a construir una residencia propia. En su testimonio, la señora Dávila Nieves sostuvo que fue víctima de un esquema de maltrato doméstico, que incluía episodios de violencia verbal, física y sicológica. En particular, testificó haber sido víctima de golpes y amenazas de muerte provenientes de su excompañero. El 4 de enero de 2008, la demandante solicitó una orden de

---

[1] Por esta causa de acción solicitó una compensación de $200,000.

protección, que eventualmente se convirtió en un dictamen bajo la Ley Núm. 140 de Remedios Provisionales.[2] Según la orden, ambas partes estaban vedadas de comunicarse entre sí. No obstante, la demandante alegó que el señor Meléndez Marín continuó llamándola, reclamándole que le pagara su participación en la casa que habían construido, pues la señora Dávila Nieves la poseía exclusivamente.[3]

En la demanda que nos ocupa, la peticionaria detalló los alegados incidentes de violencia doméstica que sufrió mientras convivía con el demandado. Por su parte, el señor Meléndez Marín negó las imputaciones. Expuso, en vez, que, durante su relación consensual, "la demandante logró convertirse en arquitecta, aprobó su reválida y que[,] evidentemente[,] su autoestima no estaba lastimada ya que, de hecho, fue talento utilizado por la campaña del producto ALLI como ejemplo de una mujer de gran autoestima".[4] El señor Meléndez Marín alegó, además, que la demanda no era más que un intento de la señora Dávila Nieves de generar un crédito a su favor para compensar, de

---

[2] Ley Núm. 140 de 23 de julio de 1974, Ley sobre Controversias y Estados Provisionales de Derecho, 32 L.P.R.A. secs. 2871-2877.

[3] Cabe señalar que, en todo momento, la señora Dávila Nieves reconoció que debería pagar por ese concepto.

[4] Sentencia del Tribunal de Primera Instancia, Apéndice petición de *certiorari*, pág. 142. Para ello, el demandado acompañó un recorte de periódico con un anuncio de las pastillas de control de peso ALLI en el que la demandante figura como modelo.

esa manera, lo que tenía que pagarle a él como resultado de la liquidación de la comunidad de bienes entre ellos.

Antes de que comenzara el desfile de la prueba, el juez superior Ismael Colón Pérez quiso, en sus palabras, "entrevistar a las partes en mi oficina, por separado, conjuntamente con mi secretaria". Pidió, primeramente, que pasara la demandante, pero antes hizo las siguientes expresiones: "Dos personas que no se conocen y una agrede a la otra, la agredida puede demandar. Aquí la señora demandó y tiene que probar su causa de acción bajo el [artículo] 1802. Es tan sencillo como eso".[5]

Según la peticionaria, el juez les indicó que no hablaría nada de los hechos del caso, sino que quería aconsejar a las partes sobre las ventajas de una negociación. Con ese entendido, ella accedió a la petición del magistrado.[6] Como consecuencia de lo anterior, se decretó un receso en sala y las partes se reunieron separadamente con el juez. Luego, las partes se reunieron con sus respectivas representantes legales. De regreso a sala, la abogada de la demandante expresó al Tribunal su preocupación, pues su clienta salió llorando de la reunión en cámara y le manifestó a su abogada que estaba muy

_____

[5] Exposición Narrativa de la Prueba, Apéndice petición de *certiorari*, pág. 53. Esta exposición narrativa fue presentada, sin objeción, por la parte demandante.

[6] Petición de *certiorari*, pág. 4.

preocupada, ya que "sentía que el juez no le creía"[7] o que "no le daría importancia a lo sucedido".[8] Tras un receso en sala, el juez expresó:

> Está bueno ya. El Tribunal hizo su gestión final. No fue fructífera[,] pues vamos a ver el juicio que es para lo que estamos aquí. Los jueces estamos para resolver controversias. Escuchar a las partes y hacer una determinación.
> …
>
> El Tribunal, como último intento, habló en cámara, en presencia de la señora María López, secretaria de sala, tanto con la demandante como con el demandado. ¿Ok? A la demandante en ningún momento, y aquí está la señora López, para que acredite que este juez nunca le dijo a ella que no le cree. Si usted le dijo eso a su abogada no dice la verdad.
>
> Demandante: No, yo nunca dije eso.
>
> Juez: No, perdóneme. Eso fue lo que me dijo su abogada.
>
> Lcda. Ward: Queremos corregir el registro; que ella entiende, que ella sintió que […] usted no le creía, no que usted se lo hubiera dicho.
>
> Juez: No, comoquiera es lo mismo. Yo no le he dicho en ningún momento, y aquí está la señora secretaria, yo en ningún momento he dicho eso, ¿ok? Al contrario, yo le di una sugerencia. No como magistrado únicamente, <u>sino como padre, como padre</u>.
>
> Es una <u>dama todavía que tiene un mundo por delante</u>. Igualmente el señor Meléndez es un hombre joven que tiene un mundo por delante. <u>Estas cosas sucedieron hace tres años y esto hay que echarlo al olvido</u>. Uno no puede seguir viviendo con ese <u>remordimiento</u> en el corazón, no empece [*sic*] como uno se sienta. Sabemos lo que es el amor, amor de padre, amor de hijo, amor de

---

[7] Exposición Narrativa de la Prueba, Apéndice petición de *certiorari*, pág. 54.

[8] Petición de *certiorari*, pág. 4.

esposo, amor de novio, amor de todo. Uno tiene que aprender a vivir y a aprender de las experiencias que uno ha tenido en la vida. <u>Uno no puede vivir con esas cosas en el corazón</u> porque no va a triunfar. Hay que tener la frente amplia, limpia para poder seguir hacia adelante…

<u>Hay que aprender a echar las cosas al olvido.</u>[9]

El desfile de la prueba comenzó después de este intercambio. Por la parte demandante, testificaron la peticionaria, su padre y el Dr. José Rodríguez Acosta.[10] A su vez, el demandado llamó como su único testigo a su madre.

En su testimonio, la señora Dávila Nieves manifestó que vivía en Estados Unidos debido al miedo que le tenía al demandado, que era arquitecta, que fue pareja del señor Meléndez Marín del 2001 al 2007 y que convivió con él los últimos cuatro años. Según ella, "desde el principio hubo eventos de maltrato verbal y se fueron acentuando hasta que llegaron a eventos de maltrato físico".[11] Dentro de ese patrón de maltrato, la demandante enfatizó tres sucesos. En la primera ocasión, en casa de la madre del demandado, él intentó meterle un cepillo por la vagina;

---

[9] (Énfasis suplido) Exposición Narrativa de la Prueba, Apéndice petición de *certiorari*, págs. 54-55.

[10] También se estipuló la declaración jurada de la señora Mayra Torres, amiga de la peticionaria.

[11] Exposición Narrativa de la Prueba, Apéndice petición de *certiorari*, pág. 56. En particular, la peticionaria testificó que el demandado la insultaba con peyorativos como "pendeja", "bruta" y "cabrona". *Id*.

ella se quejó y resistió, por lo que él la pateó en el pecho, le dijo "bruta" y "cabrona", tomó un cuchillo en las manos y le dijo "este cuchillo está bueno para matarte".[12] En la segunda ocasión, él no contestaba sus llamadas telefónicas. Cuando finalmente lo consiguió y le preguntó por qué no contestaba, el señor Meléndez Marín le dijo que él hacía lo que le daba la gana. Esa noche la pateó por la espalda mientras estaban acostados. La peticionaria expresó que no le contó nada de lo sucedido a su padre, pues no quería que éste se diera cuenta de que el demandado era así con ella y tenía miedo de que su esposo le hiciera daño a sus familiares.[13] En la tercera ocasión, tras criticar el desayuno que ella había preparado, el demandado la siguió hasta el baño insultándola, la agarró por la cara y la tiró contra la pared. La peticionaria salió corriendo del baño y logró llamar a su padre para que la fuera a recoger. El padre llegó y le preguntó al demandado por qué estaba tan agresivo. Según ella, el demandado le informó a su padre que su hija era una bruta, que tenía que aprender y que de alguna forma él le iba a enseñar.[14] Testificó que ese día

---

[12] *Id.* Según el testimonio, Dávila Nieves le contó sobre el incidente del cuchillo a dos amigos.

[13] *Id.* págs. 57-58.

[14] *Id.*

fue a buscar una orden de protección, pero "otras personas" le aconsejaron que no la pidiera.[15]

La peticionaria testificó que hubo unos cincuenta episodios de violencia verbal, sicológica, física y sexual en un periodo de dos años y medio aproximadamente. Dijo que muchos de esos episodios incluyeron sostener relaciones sexuales de manera forzada con el demandado y varios intentos de éste de introducirle objetos, como el control del televisor, por la vagina, en contra de su voluntad. Además, la señora Dávila Nieves expuso que comunicó estos hechos únicamente a la señora Mayra Torres, una de sus mejores amigas y quien la acompañó finalmente a solicitar una orden de protección, en enero de 2008; no informó de ello a sus padres. Testificó también que le tenía temor al demandado y que aún le tiene miedo. Según ella, luego de la orden del tribunal en el proceso al amparo de la Ley Núm. 140, el demandado la siguió llamando a su celular para supuestamente llegar a un acuerdo sobre el dinero que ella le tenía que dar por la casa. Aunque ella accedía, pues reconocía la deuda, el demandado también le decía que ella no se iba a quedar con la casa. Por otro lado, narró que un día se encontraron y él le dijo que le había venido bien la depresión por la que pasó porque estaba más flaca y le pidió que volvieran, a lo que ella se negó. Asimismo, testificó que, luego de la

---

[15] *Id.* pág. 58.

separación, sus padres se quedaban con ella, pues tenía miedo a dormir sola, y que luego se mudó a Estados Unidos para alejarse de la situación con su pareja.[16]

En respuesta a por qué se mantuvo viviendo con él a pesar de los actos de violencia, la señora Dávila Nieves testificó que pensaba que era una etapa pasajera y que él iba a cambiar, hasta que solicitó ayuda sicológica y siquiátrica.[17] Señaló que intentó convencer a su pareja de que buscaran ayuda en la iglesia o con un profesional de la salud, pero él se negaba.[18] Asimismo, indicó que el comportamiento del demandado en presencia de terceras personas "era diferente, amable, cariñoso[,] servicial [y] respetuoso".[19] Sobre su estado actual, testificó que ahora se siente más tranquila y más madura emocionalmente, pero, a la vez, es más desconfiada con las personas. Además, señaló que piensa que, si no habla, va a ser cómplice de lo que él hizo y cree que las mujeres tienen que "darse a respetar".[20]

Antes de comenzar el turno de contrainterrogatorio, el juez repitió que estaban ahí porque las partes no

---

[16] *Id.* pág. 60.

[17] Explicó que ella pensaba que su agresividad se debía a que el proceso de construcción del hogar matrimonial se había complicado y él estaba contrariado por ello, pero cambiaría una vez la casa estuviera lista.

[18] *Id.* pág. 60.

[19] *Id.* pág. 59.

[20] *Id.* pág. 60.

habían llegado a un acuerdo, a pesar de él haberles dado tiempo suficiente. Durante el contrainterrogatorio, <u>el juez le preguntó a la señora Dávila Nieves si habían estaciones de policía en el camino entre su casa y su trabajo, y por qué no acudió a alguna de éstas para pedir ayuda</u>. La peticionaria contestó que no lo hizo porque pensaba que el demandado cambiaría su conducta y por el temor que le tenía, pero que habló con su supervisora y el guardia de su trabajo para que no dejaran entrar a su esposo si aparecía allí.[21] A preguntas del magistrado y del abogado del demandado, la señora Dávila Nieves expresó que sólo le contó sobre los incidentes violentos con el demandado a su amiga Mayra Torres y que nunca presentó una querella ante la policía.

En cuanto a la alegación del demandado de que ella había admitido "estar bien", pues había participado en un anuncio de los productos ALLI, la señora Dávila Nieves testificó que se trató de un trabajo remunerado, que la seleccionaron tras una audición y leyó un libreto de la compañía. Es decir, que el haber expresado en el anuncio que se "sentía bien" era producto de una contratación como talento y no porque, en efecto, se sintiera así.

La parte demandante también llamó a testificar al Dr. José Rodríguez Acosta, sicólogo clínico que atendió a la señora Dávila Nieves y quien fue cualificado por el

---

[21] *Id.* pág. 61.

tribunal como perito en violencia doméstica. En su testimonio, el perito expresó que entrevistó a la peticionaria en seis ocasiones y le hizo varias pruebas siguiendo un protocolo de evaluación para casos de violencia doméstica.[22] Según el perito, el resultado combinado de todas estas pruebas permite determinar, con suficiente certeza, si la paciente está mintiendo. En su opinión pericial, tras entrevistar a la peticionaria, concluyó que ella le estaba diciendo la verdad.[23] En cuanto a su evaluación clínica del estado de la señora Dávila Nieves, el perito testificó que exhibía elementos constitutivos de maltrato y sobre los efectos negativos que ese maltrato tuvo sobre la peticionaria. Si bien manifestó que la señora Dávila Nieves no sufrió trastornos de personalidad, concluyó que era víctima de un patrón de maltrato conyugal y abuso moral y que, en efecto, sufrió daños. Específicamente, dijo que, aunque no sufrió una depresión mayor, sí experimentó un trastorno depresivo y temor persistente. Se admitió el informe del Dr. Rodríguez Acosta como evidencia.[24]

---

[22] El Dr. Rodríguez Acosta mencionó varias pruebas administradas, como la "MMP", "MMPRF", la escala de sicopatía "HAIR" y un cuestionario neurosicológico, entre otros. *Id.* pág. 68.

[23] *Id.* pág. 69.

[24] *Id.* págs. 69-70.

Al ser contrainterrogado, el Dr. Rodríguez Acosta indicó que entrevistó a la peticionaria únicamente. Aclaró que el protocolo no requiere que se entreviste al alegado agresor o a alguna otra persona, especialmente en casos como ese en que se trata de una persona adulta con capacidad plena, y que sólo se entrevista a otras personas cuando es necesario. Según el perito: "No [se] entrevistó a los familiares porque hay una administración de pruebas de las que surgen datos que establecen que la persona no está falsificando la información".[25] Por su parte, el juez le preguntó al perito por qué la peticionaria simplemente no dejaba al demandado o acudía a su padre, por qué regresaba con él después de los sucesos violentos y continuó la relación hasta enero de 2008. El perito contestó que esta conducta tiene múltiples explicaciones, entre otras, que hay mujeres que piensan que el hombre va a cambiar y rehabilitarse.[26] Añadió que, en este caso, la decisión de la víctima también estuvo influenciada por sus creencias religiosas.[27] El juez comentó que ella pudo haberse ido de la residencia o llamado a la policía.

---

[25] *Id.* pág. 73. El testigo clarificó que no se trata de un detector de mentiras y que hay un margen de error en el protocolo, pero que se trata del proceso utilizado regularmente en esos casos.

[26] Explicó que, dentro de la relación afectiva, la etapa de idealización de la pareja puede tardar muchos años en desaparecer.

[27] *Id.* pág. 74.

Incluso, expresó que "cuando uno tiene un problema lo que tiene que hacer es resolverlo".[28] Asimismo, comentó que, "según su experiencia, muchas mujeres que radican las denuncias y luego las retiran, muchas veces es por razones económicas, si el hombre es el único proveedor".[29] Según la Exposición Narrativa, "[n]uevamente preguntó el juez por [qué] si ella es una persona que se estaba preparando académicamente qu[é] le motivara [*sic*] a ella quedarse en esa relación y [por] qu[é] pasaron varios años antes de que decidiera ir al tribunal".[30] También preguntó qué le impedía a la demandante terminar la relación "si tenía al padre al lado"[31] y dado que "no estaban legalmente casados".[32]

La parte demandante llamó como testigo al señor Moisés Dávila Monserrate, padre de la peticionaria. Éste testificó que, en varias ocasiones, la veía llorosa y triste, y le preguntaba qué le pasaba pero ella no le decía nada. En una ocasión, presenció una discusión en la que el señor Meléndez Marín le dijo a su hija "t[ú] eres una bruta". En otra ocasión, testificó que recibió una llamada de su hija, quien sonaba asustada, solicitándole

---

[28] (Énfasis suplido.) *Id.* pág. 73.

[29] *Id.*

[30] (Énfasis suplido.) *Id*. pág. 74.

[31] (Énfasis suplido.) *Id.*

[32] (Énfasis suplido.) *Id*. pág. 73.

que la fuera a buscar inmediatamente. Al llegar a su casa, el señor Dávila Monserrate la encontró llorando y "vio que tenía la cara con dedos marcados". Su hija le dijo que el señor Meléndez Marín la había "agarrado por la cara", pero él decidió no intervenir porque "ese es un problema de matrimonio y uno evita meterse en eso".[33] Posterior a ello, él se quedaba a dormir en la casa de su hija para estar pendiente de ella. Según él, "[e]lla siempre estaba asustada, llegaba a la casa [y] se encerraba y tenía miedo. En esa época la veía llorosa y asustada pero no sabía [por qué]. Después de esa época, ella decidió irse a Estados Unidos".[34]

Por último, la parte demandante presentó a Mayra Torres, amiga de la peticionaria. Su declaración jurada fue estipulada, por lo cual no testificó.[35] En la declaración jurada, la señora Torres expone que, en varias ocasiones, la peticionaria le informó de los diferentes episodios de maltrato verbal, físico y sexual; que se pasaba llorando por su relación; que ella le recomendaba que la terminara, pero Dávila Nieves siempre justificaba los malos tratos, y que fue ella quien la acompañó a

---

[33] *Id*. págs. 74-75.

[34] *Id*. pág. 75.

[35] El juez expresó que entendía que era suficiente con el testimonio del padre, que presenció sucesos posteriores a los hechos alegados, y que la otra testigo no hablaba de los hechos, porque no había presenciado nada.

buscar la orden de protección.[36] Por su parte, el juez de instancia expresó que la declaración jurada "no habla de los hechos que la testigo hubiera presenciado".[37] Esto, a pesar de haberle preguntado al perito por qué la peticionaria no le contaba a nadie los alegados incidentes de violencia doméstica.

Por la parte demandada, testificó la señora Elizabeth Marín Arroyo, madre del señor Meléndez Marín. Según la testigo, la relación entre las partes era "más o menos normal, como una pareja" y, durante la época en que ellos vivieron en su casa, nunca presenció actos de violencia doméstica ni la demandante se quejó con ella. Según ella, "[e]l trato de él hacia ella era de enamorado. La trataba bien, le compraba y regalaba cosas".[38] El demandado no testificó.

Tras el desfile de prueba, el juez de instancia declaró sin lugar la demanda por daños y perjuicios.[39] En

---

[36] *Id.* págs. 78-79.

[37] *Id.* pág. 78.

[38] *Id.* pág. 80. Además, la testigo relató varios incidentes en los que le imputó a la peticionaria actuar de forma alterada e incluso la implicó en actividad delictiva.

[39] En cuanto a la liquidación de la comunidad de bienes existente sobre la propiedad inmueble, el tribunal se basó en las estipulaciones contenidas en el Informe de Conferencia de Abogados, que identificaba el valor de la obra en $185,000 con un gravamen de $68,000. Por tanto, ordenó a la peticionaria pagar la mitad del sobrante de $117,000.

su Sentencia, incluyó las siguientes determinaciones de hechos:

> (1)    Que la demandante era estudiante mientras convivía con el demandado y que finalizó sus estudios como arquitecta; que posteriormente revalidó y que trabajaba en la actualidad;

> (2)    Que la demandante "no pudo establecer mediante prueba testifical, real o material, evidencia de los graves daños físicos, según alegados en la demanda";

> (3)    Que la demandante "nunca había interpuesto ni interpuso una solicitud de orden de protección durante los años de convivencia, sino hasta enero del 2008, a pesar de no tener imposibilidad física alguna para ello. Según el propio testimonio de la demandante, tenía libertad de movimiento, trabajaba fuera del hogar, incluso durante su trayectoria vehicular para ir a la escuela u otro lugar, tenía varias estaciones de la Policía en el trayecto a donde podía acudir y nunca lo hizo";

> (4)    Que luego de que el foro de instancia emitiera una orden bajo la Ley Núm. 140, la demandante "inició y tuvo comunicación directa con el demandado durante seis (6) meses hasta su salida de la jurisdicción de Puerto Rico, a pesar de habérsele prohibido tener contacto alguno el uno con el otro";[40]

> (5)    Que la demandante "durante su testimonio en corte abierta manifestó estar más tranquila y con más madurez emocional";

> (6)    Que el perito de la parte demandante únicamente entrevistó a la peticionaria y a más nadie, por lo que "toda su evaluación sobre las partes del caso surgió de la información brindada

---

[40] No surge con claridad en qué se basa esta determinación de hecho. La única persona que testificó sobre este asunto fue la propia demandante y de la Exposición Narrativa surge que ella testificó que era el demandado quien iniciaba la comunicación. Igual ocurre con la Determinación de Hecho Núm. 12 en cuanto a que el perito sicólogo admitió que el informe pudo haber sido más completo si hubiera tenido declaraciones adicionales a las de la demandante. No encontramos nada en el expediente que valide esa determinación.

exclusivamente por la demandante durante la entrevista con ésta";

(7)     Que las conclusiones del perito no indican que la peticionaria sufriera de depresión, trastornos de personalidad ni problemas de salud, ya que la persona que sufre depresión no está en posición de hilar sus pensamientos;

(8)     Que el padre de la peticionaria no tiene conocimiento personal de las alegaciones;

(9)     Que la señora Mayra Torres no tiene conocimiento personal de las alegaciones de la peticionaria y que la "versión anterior que la testigo recogió de la demandante no fue corroborada por el testimonio de la demandante";

(10)    Que la madre del demandado no presenció ningún acto de violencia doméstica mientras las partes vivían en su residencia y que los describió "como una pareja muy enamorada";

(11) Que la demandante hizo un anuncio comercial en el que se identificó a sí misma como una mujer exitosa y que testificó que participó del mismo como talento pagado y no porque estaba de acuerdo con el contenido del mensaje.[41]

Además de estas determinaciones de hechos, la Sentencia del Tribunal de Primera Instancia indica en varias ocasiones que las alegaciones de la señora Dávila Nieves no habían sido "corroboradas".[42] Como conclusión de derecho, el tribunal sentenció que, "luego de aquilatados los testimonios de los testigos y la prueba documental presentados por la demandante, ésta no pudo establecer la conexión entre cualquier daño que haya podido sufrir la demandante y la relación consensual con el demandado. Los

---

[41] Sentencia del Tribunal de Primera Instancia, págs. 3-5.

[42] *Véanse* Determinaciones de Hechos Núms. 10, 15 y 16.

testigos presentados manifestaron no tener conocimiento personal de incidente alguno de maltrato entre las partes".[43] Además, el foro de instancia expresó en su sentencia que: "El hecho de que la demandante admitió participar en una campaña publicitaria solamente a cambio de dinero, y no porque no [*sic*] fue cierto su testimonio sobre el producto, minó su credibilidad ante el Tribunal".[44]

En cuanto a los daños sufridos por la demandante, el foro de instancia concluyó que "el perito, además, indicó que la demandante es una persona de fortaleza y, de hecho, del testimonio del perito y de la propia demandante surgió que ella terminó sus estudios como arquitecta, revalidó y está empleada en la ciudad de Chicago, Illinois".[45] Sobre la alegación de la demandante de que debía aplicarse el derecho establecido en *Santiago v. Ríos Alonso*,[46] el tribunal resolvió que "al caso de autos no le es de aplicación dicha jurisprudencia por cuanto se diferencia en que el caso citado fue resultado de una convicción

---

[43] Sentencia del Tribunal de Primera Instancia, pág. 6.

[44] (Énfasis suplido.) *Id*.

[45] *Id*.

[46] 156 D.P.R. 181 (2002). En este caso se reconoció una causa de acción civil por daños provocados por incidentes de violencia doméstica. Se catalogaron éstos como daños continuados y se estableció que el último incidente de maltrato, cuando la víctima rompe con el ciclo y reconoce que ha sufrido un daño cierto, es el que activa la causa de acción. *Id.* pág. 195.

penal por violación a la Ley 54, mientras que en la situación de autos no hubo siquiera una denuncia criminal".[47] El Tribunal concluyó que, "por no haberse probado los hechos de violencia doméstica por preponderancia de la prueba, no procede una compensación en daños y perjuicios".[48]

Inconforme con la determinación del foro primario, la señora Dávila Nieves recurrió al Tribunal de Apelaciones. Entre los diferentes señalamientos que hizo sobre la sentencia recurrida, la demandante sostuvo que la declaración jurada de la señora Mayra Torres debió considerarse como una narración coetánea de los hechos, que no debe exigirse -como aparentemente hizo el foro primario- prueba de corroboración en casos de violencia doméstica y que, no obstante lo anterior, en este caso hubo tal corroboración. Su principal señalamiento fue contra las determinaciones de hechos del foro primario. Según la peticionaria, "[l]as determinaciones de hechos del Tribunal no sólo no corresponden a la prueba desfilada, sino que se amparan en los prejuicios y preconcepciones tradicionales ya descartados por nuestro estado de derecho para cuestionar e invalidar la credibilidad de la prueba de la parte demandante, [aun]

---

[47] Sentencia del Tribunal de Primera Instancia, pág. 7.

[48] *Id*. págs. 7-8.

cuando la prueba fue una no contradicha, consistente, clara y coherente".[49]

En su sentencia, el Tribunal de Apelaciones resolvió que, dado que el foro primario no dio credibilidad al testimonio de la demandante, a pesar de que ésta no fue directamente impugnada ni contradicha y de que el demandado no testificó, debían darle deferencia a su conclusión de que no se demostró, mediante preponderancia de la prueba, la causa de acción en daños y perjuicios.[50] Inconforme, la señora Dávila Nieves recurrió ante este Tribunal.

En su petición de *certiorari*, la señora Dávila Nieves alega que la sentencia del Tribunal de Primera Instancia equivale, en esencia, a no reconocer la existencia de una causa de acción en daños y perjuicios por actos de violencia doméstica si no está precedida por una convicción en el ámbito penal. La peticionaria insiste en que, por el contrario, nuestra jurisprudencia reconoce una acción en daños y perjuicios por violencia doméstica independientemente de que haya habido encausamiento o convicción criminal. Señala, además, que la sentencia aparenta resolver que el testimonio de la víctima sobre los actos constitutivos de violencia doméstica requiere corroboración, contrario a la doctrina reiterada de este

---

[49] Apéndice Petición de *certiorari*, pág. 97.

[50] De igual forma, confirmó la determinación del tribunal de instancia sobre la división de la propiedad inmueble.

Tribunal. Finalmente, alega que el foro primario descartó el testimonio pericial y el de la propia demandante "a base de opiniones personales del magistrado".[51] En otras palabras, que medió pasión, prejuicio o parcialidad.

Para ello, hizo énfasis en las expresiones del juez de instancia antes de que comenzara el desfile de la prueba de que "hay que aprender a echar las cosas al olvido". De igual forma, resumió detalladamente su testimonio, recordando que no fue contradicho. Asimismo, alegó que el juez determinó que el testimonio de la demandante no era creíble, no porque fuera impugnado o contradicho y tampoco como resultado de su observación de la señora Dávila Nieves mientras estuvo en la silla testifical, sino por el cúmulo de preconcepciones y prejuicios sobre la violencia doméstica que demostró a lo largo del juicio y que resultaron en pasión, prejuicio o parcialidad.

En particular, la demandante señala la contradicción en la que incurrió el foro primario al cuestionar, por un lado, el que ella no hubiese pedido ayuda o contado a alguien lo que le sucedía, mientras, por otro lado, descartaba la declaración de la señora Torres sobre la narración de los episodios de violencia porque ella no tenía conocimiento personal de éstos. La señora Dávila Nieves entiende que esta conclusión también pasa por alto

---

[51] Petición de *certiorari*, pág. 2.

el testimonio de su padre, quien expresó que vio la cara marcada de su hija y escuchó al demandado insultarla.[52] Por eso, aunque argumenta que no debe exigirse prueba de corroboración como requisito de credibilidad, pues los episodios de violencia doméstica típicamente se dan en el contexto de la intimidad de la pareja, insiste en que, en este caso, hay dicha corroboración por medio del testimonio de su padre.

La peticionaria, además, cuestiona que el foro de instancia le haya restado credibilidad a su testimonio únicamente por haber participado en una campaña publicitaria. Aduce que lo hizo como talento pagado y no porque, en efecto, se "sintiese realizada" como aparecía en el anuncio. La representación legal de la peticionaria concluye:

> Ciertamente, la percepción de la demandante luego de la conversación *ex parte* que sostuvo con el juez en cámara, a instancia de este, resultó ser correcta: este estaba en efecto parcializado antes de escuchar la prueba y había prejuzgado la causa a base de sus propios prejuicios y preconceptos en cuanto al asunto de la violencia doméstica y la posición de la víctima como demandante.[53]

---

[52] En cuanto a la transformación de la Orden de Protección bajo la Ley Núm. 54 de Violencia Doméstica en una Resolución al amparo de la Ley Núm. 140, la representante legal de la demandante sostiene que accedió a ello porque la Resolución le prohibía al demandado acercarse a ella, que era lo que ésta interesaba.

[53] Petición de *certiorari*, pág. 14. La peticionaria también cuestiona la conclusión del foro de instancia en cuanto al valor de la propiedad y una supuesta estipulación de que el pago a realizarse sería de

El 21 de octubre de 2011, denegamos la petición de *certiorari*. Oportunamente, la señora Dávila Nieves solicitó reconsideración. Recalcó su convicción de que la adjudicación de credibilidad que hizo el juez de instancia responde a los prejuicios que han imperado en nuestra sociedad contra las mujeres víctimas de maltrato y a su criterio personal sobre cómo debió haber actuado la demandante.[54] La peticionaria reiteró que, aunque se le exigió incorrectamente que corroborara su testimonio o demostrara que informó a terceras personas sobre sus experiencias, el foro de instancia descartó el testimonio de las personas a quienes, en efecto, informó: su padre y la señora Torres. Cuestionó que el tribunal se refiriera a que ella logró terminar sus estudios y obtener un trabajo, como si ello invalidara su reclamo de daños por violencia doméstica. Según la peticionaria, "[n]o es necesario terminar en un hospital o en la morgue, ni con una condición mental incapacitante para establecer que en efecto ha sido víctima de violencia doméstica".[55] Expuso que el juez de instancia partió de una premisa inarticulada de que no existe una causa de acción en estos casos y que no se debe intervenir en los "asuntos de

---

solamente $40,000, en vez de $58,500, que es lo que corresponde a la mitad del valor neto de la propiedad.

[54] Moción de reconsideración, pág. 2.

[55] *Id.* pág. 4.

pareja". El 9 de diciembre de 2011, expedimos el auto de *certiorari*. Ambas partes comparecieron con sus respectivos alegatos.[56]

## II

En el desempeño de su función constitucional de resolver controversias, el Tribunal General de Justicia está estructurado de forma que las funciones judiciales estén distribuidas entre los diferentes foros que lo componen. Se trata de una organización por niveles, en la que los tribunales apelativos actúan, esencialmente, como foros revisores. Nuestra tarea principal es examinar cómo los tribunales inferiores aplican el derecho a los hechos particulares de cada caso. El desempeño de esa función revisora, tanto por el Tribunal de Apelaciones como por este Tribunal Supremo, se basa en que el Tribunal de Primera Instancia haya desarrollado un expediente completo

---

[56] En su alegato, la peticionaria expresa que "[n]o sólo existe aún una aterradora ocurrencia de eventos de violencia doméstica, sino que lamentablemente subsisten aún muchos prejuicios y paradigmas equivocados que impiden, incluso para algunos tribunales, comprender las complejidades del fenómeno y sus consecuencias". Alegato de la parte peticionaria, págs. 21-22. De igual forma, identifica varias jurisdicciones de los Estados Unidos en las que se ha reconocido una causa de acción en daños por violencia doméstica.

Por su parte, el recurrido sostiene que la causa de acción de la demandante es meramente un subterfugio para conseguir un crédito en el pago de su parte de la propiedad de la pareja y que la Exposición Narrativa de la Prueba "no demuestra el más leve indicio de que el [Tribunal de Primera Instancia] actuó movido por pasión, prejuicio o parcialidad" sino, por el contrario, que el foro de instancia no dio credibilidad ni valor probatorio al testimonio de la demandante. Alegato de la parte recurrida, pág. 4.

que incluya los hechos que haya determinado ciertos a partir de la prueba que se le presentó. Es decir, nuestra función de aplicar y pautar el derecho requiere saber cuáles son los hechos, tarea que corresponde al foro de instancia primeramente. Como tribunal apelativo, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos. Esa es la función de los tribunales de primera instancia. A partir de los hechos, los tribunales de instancia precisan las controversias, elaboran sus conclusiones de derecho y resuelven el caso.

En nuestro ordenamiento, es norma básica que las conclusiones de derecho son revisables en su totalidad por el Tribunal de Apelaciones y, de ser el caso, por el Tribunal Supremo. Tratándose de un sistema jerarquizado, la interpretación del tribunal de mayor jerarquía prevalece sobre la decisión del foro inferior. Pero esta regla viene acompañada de otra norma judicial: los foros superiores no intervendrán, como regla general, con las determinaciones de los foros primarios sobre los hechos.[57] Por el contrario y de ordinario, los tribunales apelativos

---

[57] *Véanse, por ejemplo:* Rivera Menéndez v. Action Service Corp., 2012 T.S.P.R. 73, pág. 14; S.L.G. Rivera Carrasquillo v. A.A.A., 177 D.P.R. 345, 356 (2009); Ramírez Ferrer v. Conagra Foods, 175 D.P.R. 799, 811 (2009); Trinidad v. Chade, 153 D.P.R. 280, 291 (2001); Flores v. Soc. de Gananciales, 146 D.P.R. 45, 49 (1998); Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 62-63 (1991).

aceptamos como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en sala. Después de todo, la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz. Por definición, un tribunal de instancia está en mejor posición que un tribunal apelativo para llevar a cabo esta importante tarea judicial.

Ahora bien, como toda regla, esta tiene una excepción, pues, si se determina que en la actuación del juzgador de los hechos medió pasión, prejuicio o parcialidad, o que este incurrió en error manifiesto, los tribunales apelativos podemos descartar sus determinaciones de hechos.[58] Como es de esperarse, son pocos los casos en los que hemos concluido que, en efecto, el foro de instancia incurrió en pasión, prejuicio, parcialidad o error manifiesto. Incluso, observamos que, aunque se haga referencia a todas las modalidades antes dichas, lo que casi siempre hemos identificado en estos casos es que el foro de instancia incurrió en error

---

[58] Pueblo v. Millán Pacheco, 182 D.P.R. 595, 642 (2011).

manifiesto.[59] En esas ocasiones, hemos resuelto que "aunque el arbitrio del juzgador de los hechos es respetable y merece deferencia, no es absoluto y una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal".[60] Por eso, aunque alguna prueba sostenga las determinaciones de hechos del tribunal, "si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas".[61] En el análisis de nuestra jurisprudencia es notable que, a pesar de repetir consistentemente que los tribunales apelativos no intervendremos con las determinaciones de hechos de los foros primarios a no ser que medie "pasión, prejuicio o parcialidad", nunca hemos explicado en qué consiste eso y cómo se identifica la presencia de esa mácula en una determinación judicial. Los hechos de este caso nos brindan esa oportunidad.

---

[59] *Véanse*: Serrano Muñoz v. Auxilio Mutuo, 171 D.P.R. 717 (2007); Méndez v. Morales, 142 D.P.R. 26 (1996); Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987); Ramos Acosta v. Caparra Dairy, Inc., 113 D.P.R. 357 (1982).

[60] Méndez v. Morales, *supra*, pág. 36.

[61] *Id.*, citando a Abudo Servera v. A.T.P.R., 105 D.P.R. 728, 731 (1977).

Veamos, primeramente, las diferentes opciones procesales que tiene una parte cuando entiende que un juez de instancia ha incurrido en pasión, prejuicio o parcialidad. Como veremos, el instrumento procesal apropiado dependerá de la gravedad de la situación, así como de su origen. Dada la controversia ante nuestra consideración, limitamos nuestro análisis a los casos de naturaleza civil.

Quizás el mecanismo más utilizado cuando una parte advierte que el foro de instancia incurre en pasión, prejuicio o parcialidad es la moción de inhibición. Las Reglas de Procedimiento Civil, específicamente la Regla 63, regulan este mecanismo con el propósito de salvaguardar el derecho del litigante a un debido proceso de ley.[62] La Regla 63.1 dispone que un juez o jueza debe inhibirse, ya sea a iniciativa propia o de una de las partes, en cualquiera de las siguientes situaciones:

> (a)   Por tener prejuicio o parcialidad hacia cualquiera de las personas o los abogados o abogadas que intervengan en el pleito o por haber prejuzgado el caso;
> (b)   Por tener interés personal o económico en el resultado del caso;
> (c)   Por existir parentesco de consanguinidad o afinidad dentro del cuarto grado con el (la) fiscal, procurador(a) de asuntos de familia, defensor(a) judicial, procurador(a) de menores o con cualquiera de las partes o de sus representantes legales en un procedimiento civil;
> (d)   Por existir una relación de amistad de tal naturaleza entre el juez o jueza y cualquiera de

---

[62] Martí Soler v. Gallardo Álvarez, 170 D.P.R. 1, 8 (2007).

las partes, sus abogados o abogadas, testigos u otra persona involucrada en el pleito que pueda frustrar los fines de la justicia;

(e)    Por haber sido abogado(a) o asesor(a) de cualquiera de las partes o de sus abogados(as) en la materia en controversia, o fiscal en una investigación o procedimiento criminal en el que los hechos fueron los mismos presentes en el caso ante su consideración;

(f)    Por haber presidido el juicio del mismo caso en un tribunal inferior o por haber actuado como magistrado(a) a los fines de expedir una orden de arresto o citación para determinar causa probable en la vista preliminar de un procedimiento criminal;

(g)    Por intervenir en el procedimiento de una persona natural o jurídica que le haya facilitado o gestionado algún préstamo en el que no se hayan dispensado las garantías o condiciones usuales;

(h)    Cuando en calidad de funcionario(a) que desempeña un empleo público, haya participado como abogado(a), asesor(a) o testigo esencial del caso en controversia;

(i)    Cuando uno de los abogados o abogadas de las partes sea abogado(a) de los jueces o juezas que han de resolver la controversia ante su consideración o lo haya sido durante los últimos tres años, o

(j)    Por cualquier otra causa que pueda razonablemente arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia.[63]

---

[63] Regla 63.1 de Procedimiento Civil de 2009; 32 L.P.R.A. Ap. V. R. 63.1. Por otra parte, la Regla 63.2 establece el procedimiento específico para canalizar una moción de inhibición y su contenido. Si la parte no cumple con estas formalidades, el juez o la jueza podrá continuar con los procedimientos del caso. De entender que procede su inhibición, el juez o la jueza lo hará constar mediante resolución y el caso será asignado a otro juez o jueza. Si concluye lo contrario, referirá el asunto al juez administrador o jueza administradora para que designe un juez o jueza que resuelva la moción. Regla 63.2 de Procedimiento Civil de 2009; 32 L.P.R.A. Ap. V. R. 63.2. Toda solicitud de inhibición deberá ser juramentada. Martí Soler v. Gallardo Álvarez, *supra*.

La Regla 63 de Procedimiento Civil se emplea, principalmente, cuando se conocen de antemano los posibles conflictos que podrían impedir que el juez o la jueza a quien se ha asignado el caso resuelva la controversia de manera imparcial. Muchas de las causas para solicitar la recusación de un juez o jueza reconocidas en la Regla, entre estas, las relaciones de consanguineidad o la intervención previa en otra etapa del caso, surgen de situaciones particulares entre el magistrado y una parte que pueden suscitar algún tipo de preferencia o prejuicio a favor o en contra de alguna de las partes involucradas en el pleito. Además, la Regla 63.1 anticipa la posibilidad de que el juez o jueza haya prejuzgado la controversia, es decir, que sus visiones personales controlen la adjudicación del caso, independientemente de la evidencia que se le presente y del derecho aplicable.

Bajo la Regla 63, la recusación de un juez o jueza no es una sanción disciplinaria, sino un mecanismo profiláctico procesal para garantizar la pureza de la tarea judicial.[64] Sin embargo, un juez o jueza que actúa con pasión, prejuicio o parcialidad puede incurrir también

---

[64] Cabe destacar que el que haya una regla como la Regla 63 no otorga a las partes y sus abogados un cheque en blanco para presentar mociones infundadas o frívolas que laceren la imagen de los jueces y las juezas. Le corresponde a la representación legal de las respectivas partes utilizar este vehículo procesal únicamente en aquellos casos que verdaderamente lo ameriten. *Véanse: In re* Marchand Quintero, 151 D.P.R. 973 (2000); *In re* Criado Vázquez, 108 D.P.R. 642 (1979).

en una violación a sus deberes éticos. Así lo reconoce el Canon 20 de Ética Judicial al disponer que las juezas y los jueces deben abstenerse de adjudicar, entre otros, aquellos casos en los que tengan "prejuicio o parcialidad hacia cualquiera de las personas, las abogadas o los abogados que intervengan en el pleito o por haber prejuzgado el caso".[65] La obligación de abstenerse de intervenir en un caso en esas circunstancias responde al deber ético de imparcialidad.[66] Hemos resuelto que este deber requiere a todos los integrantes de la judicatura, no sólo una conducta efectivamente imparcial, "sino además la exclusión de toda posible apariencia de parcialidad".[67] En ese sentido, el deber de desempeñar la función judicial mediante una conducta imparcial es inherente a la misión de impartir justicia.[68] Cuando no sea posible adjudicar con imparcialidad, es responsabilidad de todo juez o jueza abstenerse o inhibirse. La violación del deber ético de ser imparcial en el desempeño de la función judicial puede acarrear sanciones disciplinarias.

Otra alternativa disponible para la parte que entienda que en la actuación de un juez o jueza ha mediado

---

[65] Canon 20 de Ética Judicial. Como puede observarse, el canon está redactado de manera muy parecida a la Regla 63.1 de Procedimiento Civil.

[66] In re Grau Acosta, 172 D.P.R. 159 (2007).

[67] Id. pág. 171.

[68] Id.

pasión, prejuicio o parcialidad es acudir a un foro superior, como ocurrió en el caso de autos, aduciendo que el tribunal de instancia erró al apreciar la prueba, adjudicar credibilidad o determinar los hechos. Esta alegación no debe hacerse ligeramente, pues "la grave atribución de prejuicio o parcialidad a un juez, que implica deslealtad a los principios fundamentales que gobiernan su ministerio, debe ser cuidadosamente ponderada frente a la grave responsabilidad de quien la formula gratuitamente".[69] Al igual que en una moción bajo la Regla 63, quien señale que el juzgador actuó mediando pasión, prejuicio o parcialidad debe sustentar sus alegaciones con evidencia suficiente, pues éstas no deben convertirse en un instrumento para ejercer presión contra el tribunal de primera instancia.

El nivel de pasión, prejuicio o parcialidad que hace falta demostrar para impugnar exitosamente las determinaciones del foro primario sobre los hechos varía de caso a caso, pero no es necesario probar una violación al Canon 20 de Ética Judicial. Más bien, el estándar se asemeja al de la Regla 63 de Procedimiento Civil pues, más que una sanción disciplinaria contra el juez o la jueza, lo que se pretende lograr es que la controversia ante la consideración del poder judicial sea adjudicada con imparcialidad. La diferencia estriba en que, distinto a

---

[69] Pueblo v. Santiago Agricourt, 108 D.P.R. 612, 619 (1979) (Sentencia).

cuando se invoca la Regla 63, la pasión, prejuicio o parcialidad que puede dar base a la revocación de un dictamen por un foro de mayor jerarquía no necesariamente surge de situaciones conocidas antes del juicio ni de algún conflicto individual y específico entre el adjudicador y una de las partes, sus abogados o testigos, sino que tiende a manifestarse durante el proceso mismo, particularmente, durante el juicio en los méritos. Precisamente, porque lo que se impugna es la adjudicación de credibilidad y la determinación de los hechos, la conducta, participación y expresiones del magistrado durante el proceso judicial serán los elementos a tomarse en consideración para evaluar si, en efecto, éste incurrió en pasión, prejuicio o parcialidad.

Obviamente, pueden darse circunstancias durante un juicio que den lugar a que se solicite la inhibición de un juez o una jueza bajo la Regla 63. De igual forma, ante el foro revisor, se puede alegar que el juez o la jueza de instancia erró al hacer ciertos comentarios o al incurrir en determinada conducta antes o después de la presentación de la prueba, en la medida en que este proceder revela la existencia de pasión, prejuicio y parcialidad en la determinación de los hechos. Al fin y al cabo, se trata de dos vehículos procesales que, si bien tienen objetivos similares, están dirigidos a foros distintos. La Regla 63 de Procedimiento Civil está dirigida principalmente al

Tribunal de Primera Instancia, mientras que la impugnación de la apreciación de la prueba por pasión, prejuicio y parcialidad está dirigida a los tribunales revisores. Lo ideal es que, cuando se conozcan de antemano las razones por las cuales un juez o una jueza no podrá adjudicar imparcialmente una controversia, se utilicen los mecanismos establecidos por la Regla 63. De igual forma, cuando son la conducta y las expresiones del juez o la jueza de instancia durante el pleito las que demuestran la existencia de pasión, prejuicio o parcialidad, corresponde a los tribunales apelativos, en su función revisora, corregir la situación.

Lo que constituye pasión, prejuicio o parcialidad dependerá de las circunstancias particulares de cada caso. Si la conducta del juzgador de instancia demuestra que su evaluación de la prueba y sus determinaciones de hechos fueron producto de valores, creencias, opiniones y concepciones personales ajenas al derecho, ello supone que no adjudicó la controversia con la imparcialidad, la objetividad y el desinterés que garantizan un proceso justo. En síntesis, ante una alegación de pasión, prejuicio o parcialidad, los foros apelativos debemos evaluar si el juez o la jueza cumplió su función judicial de adjudicar la controversia específica conforme a derecho y de manera imparcial, pues sólo así podremos descansar con seguridad en sus determinaciones de hechos.

III

Este Tribunal utilizó la frase "pasión, prejuicio o parcialidad", tal y como la conocemos hoy, por primera vez, en *Roig v. Rodríguez*, resuelto en 1910.[70] Además, en *Lamas Méndez v. Betancourt*,[71] resuelto poco después de *Roig*, el Tribunal se refirió a varios casos anteriores que, si bien no utilizaron la frase "pasión, prejuicio o parcialidad", sirvieron como fundamento para justificar la deferencia que los tribunales apelativos deben a las determinaciones de los foros primarios.[72] Pero los primeros atisbos de la frase finalmente acuñada en *Roig* se remontan a 1907, cuando, en *Pueblo v. Díaz alias Leña Verde*, resolvimos que "[c]omo regla general puede decirse que esta corte no revisará la decisión del jurado sobre una cuestión de hecho, a no ser que la misma sea

---

[70] 16 D.P.R. 207, 212 (1910).

[71] 16 D.P.R. 280 (1910).

[72] El caso más antiguo en esa lista es Román v. C.A. Americana de Ferrocarriles, 10 D.P.R. 53, 59 (1907). A su vez, en Torruella v. Vázquez, 16 D.P.R. 377 (1910), se citan los casos originales que justifican el uso de la frase "pasión, prejuicio o parcialidad", añadiendo el propio caso de Lamas Méndez, *supra*, a esa lista. Finalmente, en El Pueblo v. Martínez, 16 D.P.R. 715 (1910), se utiliza la frase "pasión, prejuicio o parcialidad", esta vez sin referirse a los casos mencionadas en Lamas Méndez. De esa forma comenzó el largo historial de la frase hasta nuestros días. *Véase, además*, Sucesión Iglesias v. Bolívar, 11 D.P.R. 441 (1906). Román y Sucesión Iglesias fueron los casos más citados en controversias sobre apreciación de la prueba y la deferencia debida a los tribunales de instancia. *Véanse*: Lowande v. García et al., 12 D.P.R. 304 (1907); Pagán v. Quiñones, et al., 13 D.P.R. 317 (1907).

evidentemente errónea, o el resultado de <u>parcialidad, apasionamiento o prejuicios</u>".[73]

En realidad, la frase "parcialidad, apasionamiento o prejuicios" es una traducción de la frase en inglés "*partiality, passion or prejudice*", utilizada por primera vez en *Pueblo v. Díaz alias Leña Verde* por el Juez Asociado MacLeary, uno de varios integrantes del Tribunal que escribían en inglés.[74] Se emplean las mismas palabras que en *Roig v. Rodríguez,* pero en un orden distinto.[75] Lo mismo sucedió en otros casos de esa época redactados originalmente en inglés.[76] En otras palabras, la frase "pasión, prejuicio o parcialidad" es la versión final de la traducción al español de una frase en inglés que fue utilizada de manera uniforme en las decisiones redactadas originalmente en ese idioma. En aquella época también resolvimos que el abuso de discreción que constituye actuar mediando pasión, prejuicio o parcialidad debe demostrarse "claramente".[77]

---

[73] (Énfasis suplido) 12 D.P.R. 144, 154 (1907). Esta frase también fue utilizada en <u>El Pueblo v. Dumas</u>, 14 D.P.R. 397, 406 (1908).

[74] <u>The People v. Díaz, alias Leña Verde</u>, 12 P.R.R. 141, 151 (1907).

[75] "*Passion, prejudice or partiality*". <u>Roig v. Rodríguez</u>, 16 P.R.R. 198, 203 (1910).

[76] *Véase*, por ejemplo, <u>El Pueblo v. Cancel</u>, 13 D.P.R. 178 (1907).

[77] <u>Auffant v. Serra *et al.*</u>, 14 D.P.R. 41, 58 (1908).

El propio Juez MacLeary nos explica no sólo el origen angloamericano de la frase bajo estudio sino que su empleo en Puerto Rico <u>no conllevó la importación de toda la normativa y los significados atribuidos a la frase en su lugar de origen</u>. Así, en *Pueblo v. Cancel*, resuelto en 1907, recalca que, en vez de utilizar los criterios desarrollados por el Tribunal Supremo de los Estados Unidos, "nosotros no queremos basar nuestra decisión en ese motivo, sino que preferimos seguir la regla sentada en el caso de [*Pueblo v. Díaz alias*] *Leña Verde*".[78] No obstante, debemos discutir brevemente el significado corriente de esta frase en la tradición jurídica estadounidense, en camino a nuestra propia definición.

De entrada, vemos un desfase importante: la frase "pasión, prejuicio o parcialidad" en la tradición norteamericana es empleada, principalmente, para la revisión de partidas de daños otorgadas por jurados en casos de responsabilidad civil.[79] En particular, muchos tribunales estadounidenses han concluido que puede inferirse que medió pasión, prejuicio o parcialidad en la decisión del jurado cuando la cuantía otorgada es

---

[78] (Énfasis suplido.) 13 D.P.R. 178, 191 (1907). *Véase* <u>The People v. Cancel</u>, 13 P.R.R. 179, 191 (1907).

[79] T. Kubes, "Partiality, Passion and Prejudice: The Necessity of Postveredict Judicial Review", 7 U. Fla. J.L. & Pub. Pol'y 373 (1996).

exageradamente alta.[80] Pero los tribunales apelativos estadounidenses han reconocido la dificultad que representa intervenir con la apreciación de un jurado y, por eso, han sido cuidadosos en la aplicación de este estándar. Se trata, pues, de un criterio difícil de aplicar y cuyo uso se ha limitado, principalmente, a la revisión de la cuantía otorgada por concepto de daños.[81]

Evidentemente, nuestra situación es muy distinta y nos permite adoptar un estándar mucho más elaborado y útil, pues no está presente la posibilidad de chocar con la institución del jurado en casos civiles. El Juez MacLeary reconoció esta distinción y descartó, desde el inicio, que se recurriera a la norma norteamericana para darle forma al criterio adoptado. Se trata, pues, de un estándar de configuración puertorriqueña, a pesar de que, en su origen, fue importado.

En Puerto Rico, aunque el Tribunal adoptó el estándar de pasión, prejuicio o parcialidad como límite a la deferencia debida a los foros de instancia en su apreciación de la prueba, en todos los casos citados se confirmó la decisión del tribunal primario. Más aun, a

---

[80] *Id*. pág. 374. *Véanse*, por ejemplo: Belknop v. Boston & M. R.R., 49 N.H. 358 (1870); Agee v. Nelson, 21 Ala. App. 545 (1926). Este análisis tiene su génesis en la tradición del derecho común inglés y de la era colonial norteamericana. Kubes, *supra*, pág. 380.

[81] "Nevertheless, because of the difficulty of proving juror reasoning, passion and prejudice review was, in fact, review of the amount of award". Honda Motor Co. v. Oberg, 512 U.S. 415, 425 (1994).

través del tiempo, el Tribunal ha tendido a utilizar el estándar de "error manifiesto" para descartar la apreciación de la prueba hecha por el tribunal de instancia.[82]

De igual forma, tan temprano como en 1909, resolvimos que el estándar de pasión, prejuicio, parcialidad o error manifiesto incluía también cualquier "otro motivo semejante" que justificara descartar la apreciación de la prueba, adjudicación de credibilidad y determinaciones de hechos.[83] La consecuencia ha sido mantener el criterio de "pasión, prejuicio o parcialidad" en un estado de indefinición, convirtiéndolo en una expresión sin contenido preciso y, por lo tanto, de poca utilidad, a pesar de su uso casi a diario en nuestro ordenamiento. La Asamblea Legislativa tampoco ha precisado el significado de la frase "pasión, prejuicio o parcialidad" y hay muy poco comentario al respecto en nuestra doctrina. Ante tal

---

[82] *Véanse:* Soc. de Gananciales v. Serrano, 145 D.P.R. 394 (1998); Pueblo v. Sanabria Pérez, 113 D.P.R. 694 (1983); Pueblo v. Espinet Pagán, 112 D.P.R. 531 (1982); Sanabria v. Sucn. González, 82 D.P.R. 885 (1982); García v. A.F.F., 103 D.P.R. 356 (1975); Pueblo v. Santos, 97 D.P.R. 193 (1969); Sierra, Comisionado del Trabajo v. Eastern Sugar Associates, 71 D.P.R. 888 (1950); Junta Administradora del Muelle Municipal de Ponce v. P.R. American Sugar Refinery, Inc., 70 D.P.R. 361 (1949); Pueblo v. Torres, 56 D.P.R. 605 (1940); Picón v. Central Cambalache, Inc., 48 D.P.R. 510 (1935); Swiggett v. Colmore *et al.*, 30 D.P.R. 165 (1922); Rosado v. Ponce Railway and Light Company, 20 D.P.R. 564 (1914).

[83] Cruz v. Hernández, 15 D.P.R. 189, 192 (1909).

vacío y dado que ese estándar fue una criatura jurisprudencial, debemos definirlo.

Comenzamos, lógicamente, con las definiciones particulares adoptadas para las palabras "pasión", "prejuicio" y "parcialidad". Según la Real Academia Española, "pasión" se define como "perturbación o afecto desordenado del ánimo; inclinación o preferencia muy vivas de alguien a otra persona; apetito o afición vehemente a algo".[84] En cuanto a "prejuicio", éste se define como "prejuzgar; opinión previa y tenaz, por lo general desfavorable, acerca de algo que se conoce mal".[85] El Diccionario de Términos Jurídicos lo define como "juzgar las cosas antes del tiempo oportuno, o sin tener de ellas conocimiento cabal".[86] Por último, la Real Academia define "parcialidad" como "amistad, estrechez, familiaridad en el trato; designio anticipado o prevención a favor o en contra de alguien o algo, que da como resultado la falta de neutralidad o insegura rectitud en el modo de juzgar o de proceder".[87]

---

[84] Diccionario de la Real Academia Española, 22a ed.

[85] *Id*. Por su parte, el Diccionario define "prejuzgar" como "juzgar de las cosas antes del tiempo oportuno, o sin tener de ellas cabal conocimiento". *Id*.

[86] I. Rivera García, Diccionario de Términos Jurídicos, 3ra ed. revisada, San Juan, Lexis-Nexis, 2000, pág. 206.

[87] Diccionario de la Real Academia Española, 22a ed. Igual definición adopta Ignacio Rivera García en su Diccionario de Términos Jurídicos, *op. cit*., pág. 188.

Aunque las definiciones que encontramos en los diccionarios pueden servir de punto de partida en la búsqueda de una definición jurídica, su utilidad es bastante limitada. Las palabras, nos dice el Código Civil, deben entenderse en su sentido usual.[88] Sin embargo, puede no ser tan usual su contexto y, por eso, muy particular su sentido. En realidad, el contexto jurídico define las palabras más allá de lo que diga el diccionario. Y en el contexto jurídico lo que importa no es tanto el definir la frase, sino asegurar su utilidad. Ya en *Pueblo v. Maldonado Dipiní* señalamos que "el prejuicio o parcialidad debe ser *personal* y no *judicial*. Prejuicio personal significa una actitud extra-judicial en su origen".[89]

Concluimos, entonces, que incurre en "pasión, prejuicio o parcialidad" aquel juzgador que actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna.

---

[88] Art. 15, Código Civil de Puerto Rico, 31 L.P.R.A. sec. 15.

[89] Pueblo v. Maldonado Dipiní, 96 D.P.R. 897, 910 (1969). En este caso se determinó que el hecho de que un juez hubiese intervenido en casos anteriores contra el mismo acusado no demostraba que tuviera un prejuicio personal contra él que no le permitiera adjudicar de forma imparcial en un nuevo caso independiente.

IV

Como integrantes de la Rama Judicial, estamos comprometidos a contribuir a erradicar de nuestra sociedad el problema de la violencia doméstica, que es, sin duda, uno de los más graves problemas sociales en nuestro país. La política pública vigente es de repudio enérgico a esa conducta porque es contraria a los valores de paz, dignidad y respeto que nuestro pueblo quiere mantener para los individuos, las familias y la comunidad en general.[90]

Con la aprobación de la Ley Núm. 54 de 15 de agosto de 1989, se implantó una política pública que tiene el importante efecto de destapar el nocivo proceso de racionalización sobre la violencia doméstica que se utiliza a menudo para justificar la agresión y que contribuye a perpetuar este mal social.[91] Como explica la profesora Resumil, "[e]sta racionalización conduce a excusar ese comportamiento criminal: (1) devaluando a la víctima por considerar que ésta no posee valor alguno en sí misma o por haber actuado en forma que hace que la agresión sea merecida; (2) negando a la víctima, convencido de que ésta no sufrirá o que es la agresión lo que ésta realmente desea; (3) redefiniendo su conducta, no como un acto criminal, sino como justiciero o retributivo, y (4) considerando injusta la ley que prohíbe o exige la

---

[90] Art. 1.2, Ley Núm. 54 de 1989, 8 L.P.R.A. sec. 601.

[91] *Véase id.*

conducta, por lo que se justifica su actuación".[92] En ese sentido, "[c]ruzarnos de brazos y no alzar nuestras voces para condenar enérgicamente la crasa ignorancia de muchos equivaldría a convertirnos en cómplices de esta intolerable situación".[93]

No podemos olvidar que la violencia doméstica es "una de las manifestaciones más críticas de los efectos de la inequidad en las relaciones entre hombres y mujeres".[94] Desafortunadamente, la lucha por erradicar la violencia doméstica choca con los prejuicios que aún existen en nuestra sociedad y que se manifiestan en actitudes y acciones como: considerar que la violencia doméstica es algo trivial, pensar que se trata de un asunto privado al seno de la pareja en el que la sociedad no debe intervenir u opinar que las víctimas de violencia doméstica exageran. Como miembros de la comunidad, los jueces y las juezas no somos inmunes a estos prejuicios. No obstante, estamos llamados a contribuir para a lograr los objetivos de la política pública sobre la violencia doméstica y no a obstaculizarla al incurrir en procesos de racionalización que favorecen el tipo de conducta que se quiere erradicar.

---

[92] O.E. Resumil Sanfilippo, "Criminología General", 2da ed., San Juan, Ed. UPR, 1992, pág. 210, citada en Pueblo v. Rivera, 133 D.P.R. 444, 485 (Voto particular y de conformidad de la Jueza Asociada Naveira, 1993).

[93] San Vicente v. Policía de P.R., 142 D.P.R. 1 (Sentencia, 1996); Opinión de Conformidad de la Jueza Asociada Naveira, id. pág. 8.

[94] Art. 1.2, Ley Núm. 54 de 1989, 8 L.P.R.A. sec. 601.

De otra manera, la víctima sería víctima doblemente, de su agresor y del proceso judicial.

Venimos lidiando con este problema desde hace mucho tiempo. En su Opinión de conformidad en *San Vicente v. Policía de P.R.*, resuelto mediante Sentencia en 1996, la entonces Jueza Asociada Naveira expresó que "[a] pesar del alto número de casos de violencia doméstica, y de ser éste un problema que trasciende líneas raciales, económicas y sociales, los fuertes patrones culturales, producto de muchos años de un ordenamiento social que implícitamente justificaba el que los hombres fueran violentos contra la mujer, son responsables de que los delitos que se conciben como graves y severos cuando se dan dentro del marco general de la sociedad no se vean tan graves y serios cuando se dan en el ámbito de la familia".[95] De igual forma, la Jueza nos alertó: "Los organismos y funcionarios responsables de proteger a las víctimas de agresión, como son los funcionarios del Sistema Judicial y el personal de apoyo del ejecutivo, incluyendo los jueces, fiscales y miembros del Cuerpo de la Policía de Puerto Rico, no estamos libres de actitudes contrarias a la política pública sobre el problema de la violencia doméstica".[96] En esta Opinión de conformidad, la Jueza Asociada Naveira

---

[95] (Énfasis suplido.) San Vicente v. Policía de P.R. (Opinión de Conformidad de la Jueza Asociada Naveira), *supra*, pág. 13.

[96] (Énfasis suplido.) *Id.* pág. 14.

cité del "Primer Informe de Progreso sobre la Implantación en Puerto Rico de la Ley para la Prevención e Intervención con la Violencia Doméstica", preparado por la Comisión de Asuntos de la Mujer de la Oficina del Gobernador en 1991:

> El factor que más ha afectado el progreso en la implantación de esta Ley ha sido el poco apoyo que ha recibido la misma desde las posiciones de liderato que ocupan las/los funcionarios de más alto nivel de las agencias del Sistema de Administración de la Justicia. Las actitudes y opiniones de los/las líderes del Sistema han contribuido a crear confusión interna entre los funcionarios públicos llamados a hacer cumplir esta Ley en su trabajo diario y entre la ciudadanía. Esta situación coloca en mayor riesgo a las víctimas reales y potenciales de la violencia doméstica ya que pueden continuar viendo al Sistema, en cierta medida, aliado del agresor y pueden sentirse disuadidas de utilizar los remedios que la Ley intentó poner a su alcance.[97]

Estas expresiones se hicieron hace casi dos décadas. Desde entonces, la Rama Judicial se ha esforzado por trabajar contra la violencia doméstica. Entre las medidas tomadas por nuestra institución se encuentran: proveer adiestramientos especializados a jueces y juezas, preparar un Libro de Estrado sobre órdenes de protección en casos de violencia doméstica, publicar un Protocolo de manejo de caso de violencia doméstica, crear salas especializadas en

---

[97] *Id*. pág. 15. Por último, la Jueza Asociada cita nuestras expresiones en Pueblo v. Esmurria Rosario, 117 D.P.R. 884, 893-894 (1986), a los efectos de que "[l]os jueces somos la última autoridad en el sistema judicial. Si no logramos manejar los casos de violencia, en este caso en específico contra la mujer, con el enfoque e interés judicial apropiados, corremos el peligro de hacer que estos crímenes sean considerados como algo trivial e insignificante". *Id*. pág. 16. *Véase también* Pueblo v. Rodríguez Velázquez, 152 D.P.R. 192, 205 (2000).

casos de violencia doméstica en diversas regiones judiciales, brindar servicios de intercesoras y representación legal a víctimas de violencia doméstica, revisar los formularios relacionados con la Ley 54 y establecer un sistema de órdenes de protección automatizadas.[98] Sin embargo, queda trabajo por hacer.

Nuestra sociedad lleva mucho tiempo luchando contra la violencia doméstica y contra la resistencia de ciertos sectores, incluyendo algunos miembros de la judicatura, a reconocer la gravedad de dicho problema social. Por ejemplo, en *In re Elba Santiago Rodríguez*, una jueza incurrió en un "patrón de conducta constitutiva de discrimen por género contra las víctimas de violencia doméstica",[99] demostrado por sus comentarios y actos parcializados cuando atendía controversias de esa naturaleza, entre estos: no atender a una víctima porque tenía en sus brazos a su hija pequeña; expresar que las mujeres tomaban las solicitudes de órdenes de protección "a relajo"; culpar a una denunciante de causar un incidente de violencia doméstica por dedicarse a estudiar y estar enferma; expresar en una vista que el caso era una pérdida de tiempo; manifestar que no encontraría causa

---

[98] *Véase* Rama Judicial de Puerto Rico, Programa Violencia Doméstica, http://www.ramajudicial.pr/DPJ/Programa-Violencia-Domestica.htm; Órdenes de protección, http://www.ramajudicial.pr/servicios/proteccion.htm.

[99] 160 D.P.R. 245, 249 (2003).

probable "por un simple jalón de pelo"; llamar mentirosas a las víctimas y acusarlas de inventar situaciones por celos, y mencionar que le solicitaban órdenes de protección para poder escaparse con otro hombre y "sacarse a sus parejas de encima".[100] Resolvimos que esa conducta revela la presencia de pasión, prejuicio y parcialidad en su modalidad más extrema y configura una seria violación al deber ético de todo juez o jueza de adjudicar imparcialmente las controversias ante su consideración.[101]

No podemos permitir que interfieran con el quehacer judicial los conceptos culturales y sociales que todo ser humano posee y de los que, a veces, es difícil deshacerse. Tampoco podemos tolerar que todavía hayan jueces y juezas, por pocos que sean, que entiendan que el Estado no debe intervenir en asuntos de violencia doméstica, salvo que se trate de un caso extremo; que le recriminen a las mujeres que deciden denunciar a su agresor el que no lo hayan abandonado o sometido al rigor de un proceso policial, demostrando que no comprenden adecuadamente el comportamiento de las víctimas de violencia doméstica, o que simplemente opten por no creerles. Cuando esto ocurre, es peligroso sostener las determinaciones de hechos del

---

[100] *Id.* En este caso, la jueza fue suspendida y renunció a su cargo.

[101] Sin embargo, como hemos dicho, no toda manifestación de pasión, prejuicio o parcialidad al apreciar la prueba viola los Cánones de Ética Judicial.

foro primario, pues la presencia de un adjudicador imparcial es elemento fundamental del debido proceso de ley.[102]

V

En el caso de autos, el tribunal de instancia no evaluó la prueba ni determinó los hechos de manera imparcial. Diversas manifestaciones del juez, desde las que hizo antes del juicio hasta las que expresó en la Sentencia, reflejaron que tenía una actitud formada previamente en torno al caso.

Como norma general, no se puede inferir prejuicio ni parcialidad por el solo hecho de que un juez del foro primario se reúna en su despacho con las partes. No obstante, los jueces han de tener presente que deben evitar celebrar entrevistas privadas con las partes o sus abogados.[103] En este caso, la decisión del juez de reunirse en cámara con las partes separadamente, sin la presencia

---

[102] *Véase* <u>Torres v. Junta Ingenieros</u>, 161 D.P.R. 696 (2004).

[103] El Canon 12 de Ética Judicial establece que: "Las juezas y los jueces no celebrarán entrevistas privadas con las partes o sus abogadas o abogados ni permitirán comunicaciones o argumentos de éstas o éstos que pretendan influir en su actuación judicial en asuntos de su competencia o bajo su consideración, cuando los otros intereses que puedan ser afectados no estén representados ante el tribunal, excepto en casos no contenciosos, en los que deberán actuar con suma cautela". El comentario a este canon explica que se prohíben las reuniones *ex parte*, pero se permiten ciertas comunicaciones sobre aspectos procesales del caso. En las reuniones que los jueces celebren en el curso de los procedimientos, deben estar presentes todas las partes.

de sus representantes legales, previo al desfile de la prueba, fue poco prudente y desacertada.

Ya vimos que, al salir de la reunión, la señora Dávila Nieves expresó con preocupación a su abogada que tenía la impresión de que el juez no le creería o no le daría importancia a lo sucedido. En segundo lugar, al intentar aclarar en sala este suceso, las expresiones del juez sembraron duda sobre su habilidad de adjudicar la controversia de manera imparcial. Esas expresiones, antes de la presentación de la prueba, permiten concluir que el juez estaba parcializado contra la causa de acción de la demandante. Es decir, éstas no necesariamente suponen un ánimo adverso prejuzgado en cuanto a la credibilidad de la señora Dávila Nieves, sino el convencimiento del juez de instancia de que, aún si las alegaciones fueran ciertas, éstas no ameritaban una acción por parte del tribunal. De hecho, en varias ocasiones, el juez manifestó que estaban ahí, viendo el caso, porque las partes no se pusieron de acuerdo, a pesar de que él les dio oportunidad para ello.

En este punto, debemos recordar que, a pesar de que la Ley Núm. 54 es, principalmente, un estatuto de naturaleza criminal, nuestro ordenamiento ha reconocido los efectos civiles de un acto de violencia doméstica. En *Santiago v. Ríos Alonso*, dimos paso a una causa de acción en daños y perjuicios por agresiones físicas y emocionales

en el contexto de una relación de pareja.[104] En dicho caso resolvimos que "los actos de maltrato físico, emocional y sicológico componen un cuadro de daños que, unidos, van encadenándose para producir el efecto neto del maltrato y así, en dicha circunstancia, el último daño acaecido forma parte de ese ciclo de maltrato y genera la causa de acción por ésta y por los actos de maltrato anteriores componentes del referido patrón de violencia".[105] Por tratarse de una causa de acción civil, que no requiere prueba más allá de duda razonable, no hace falta una convicción en la esfera penal para poder presentar una demanda.

Pero, en el caso ante nuestra consideración, aún antes del juicio, el juez advirtió que los sucesos en controversia "sucedieron hace tres años", que "hay que echarlo al olvido" y que no "se puede seguir viviendo con ese remordimiento en el corazón", y todo esto lo sugería "[n]o como magistrado únicamente, sino como padre". Tal parece que, según el magistrado, los actos de violencia entre una pareja ocurridos en el pasado no son serios y hay que echarlos al olvido. Evidentemente, esas expresiones no responden al ejercicio de la función judicial, sino a una opinión muy personal del juez. Recordemos que estas expresiones se hicieron cuando el

---

[104] 156 D.P.R. 181 (2002).

[105] (Énfasis en el original.) *Id*. pág. 192.

desfile de la prueba no había siquiera comenzado. Así, surge con claridad que el juez de instancia estaba predispuesto a no favorecer la causa de acción de la demandante.

Las expresiones del magistrado durante el juicio en sus méritos también generan duda sobre su imparcialidad, tanto respecto a la demandante como hacia su causa de acción en general. Vimos que el juez de instancia le cuestionó insistentemente al perito de la demandante la razón por la cual ella no acudió a la policía a denunciar a su agresor, por qué tardó tanto en terminar la relación si era una persona preparada académicamente y que no dependía económicamente de su pareja, pues "cuando uno tiene un problema lo que tiene que hacer es resolverlo", y por qué no recurrió a su padre.[106] Además, dio a entender que la señora Dávila Nieves no tenía motivo para permanecer en la relación con el demandado ya que no estaban casados legalmente.[107] En sus determinaciones de

---

[106] Recuérdese que, según el testimonio del padre, él siempre apoyó a su hija, la acompañó cuando tenía miedo y la buscó cuando lo llamó, pero no se esforzaba por averiguar qué le pasaba cuando la veía triste ni intervino cuando fue testigo de una situación de violencia entre ella y su pareja porque pensaba que esos eran problemas matrimoniales con los que no tenía que meterse.

[107] Uno de los retos que confronta la Rama Judicial es precisar cómo el fenómeno de la violencia doméstica afecta el quehacer judicial, particularmente cuando se adjudica una controversia sobre este tema. A esto responde, en parte, el que nuestra jurisprudencia haya permitido el uso de informes periciales sobre el síndrome de la mujer maltratada, pues resulta necesario poner al tribunal en

hechos, el juez de instancia resalta lo que fueron sus preguntas, sin incluir las explicaciones que ofreció el perito.[108] De lo anterior surge una aversión del juez de instancia hacia las personas que alegan ser víctimas de violencia doméstica o, por lo menos, su ignorancia en cuanto a la conducta usual de las víctimas del ciclo de violencia doméstica. Según dejó ver el magistrado, nada justifica que las víctimas de violencia doméstica no denuncien a su agresor y se salgan de la relación.

En realidad, las determinaciones de hechos del foro de instancia no concuerdan con la prueba desfilada y contienen contradicciones importantes. Por ejemplo, el juez cuestionó el que la demandante no hubiera solicitado ayuda ni le hubiera contado sus problemas a nadie. Sin embargo, cuando la demandante produjo como testigo a su amiga Mayra Torres, a quien le contó lo que le sucedía, el magistrado descartó completamente el testimonio de ésta

---

condición de entender por qué las víctimas actúan de cierta manera. Entender el síndrome de la mujer maltratada nos permite comprender por qué una víctima de violencia doméstica no abandona a su victimario o por qué no solicita ayuda de sus familiares o de las autoridades. Lo anterior se suma a las cargas sociales y culturales ya mencionadas. *Véanse:* Pueblo v. González Román, 138 D.P.R. 691 (1995); Pueblo v. González Román, 129 D.P.R. 933 (1992).

[108] *Véanse* las determinaciones de hechos núms. 3-15. De igual forma, el foro de instancia descartó el testimonio del perito de la demandante porque éste no había entrevistado al padre de la demandante y al demandado. No obstante, el perito explicó el protocolo para este tipo de casos y lo raro que es que se tenga que entrevistar a la pareja de la víctima.

porque la amiga no tenía conocimiento personal de los hechos.[109] De igual forma, a pesar de que la demandante testificó que el demandado se comunicó con ella después de haberse dictado la Resolución bajo la Ley Núm. 140 y de que el demandado nunca testificó en sentido contrario, el tribunal determinó, como cuestión de hecho, que fue la señora Dávila Nieves quien se comunicó con el demandado.[110]

De la Sentencia del tribunal de instancia no surge con claridad si dicho foro no creyó en lo absoluto a la señora Dávila Nieves, si concluyó que faltaba prueba de corroboración o si estaba indispuesto a reconocer una causa de acción por violencia doméstica sin una convicción previa en la esfera criminal. No obstante, hay indicios de que todos estos factores estuvieron presentes y que responden a las concepciones personales del juez. El magistrado no concluye que el testimonio de la señora Dávila Nieves no le mereciera credibilidad. La única expresión al respecto fue la referencia a la participación de la demandante en un anuncio del producto ALLI. Sobre ello indica que el que ella participara "en una campaña publicitaria solamente a cambio de dinero y no porque no [*sic*] fue cierto su testimonio sobre el producto, <u>minó su credibilidad ante el Tribunal</u>".[111] Es decir, el tribunal

---

[109] *Véase* la determinación de hecho núm. 16.

[110] *Véase* la determinación de hecho núm. 5.

[111] *Véase* nota núm. 27.

concluyó que una persona que realiza anuncios a favor de un producto porque le remuneran y no porque crea en las bondades del mismo no merece credibilidad ante un tribunal de justicia sobre un asunto totalmente desvinculado de la publicidad comercial en la que trabajó. Tal conclusión no puede prevalecer.

En varias ocasiones, el foro de instancia hizo referencia a que las alegaciones de la demandante no fueron corroboradas.[112] De esa manera, revivió la norma que declaramos inconstitucional en *Comisión de la Mujer v. Secretario*, es decir, que se requiriera corroboración del testimonio de una mujer en casos de violación.[113] También hizo caso omiso al principio de derecho que recoge la Regla 110(d) de Evidencia de 2009, a saber, que la evidencia directa de un testigo que merece entero crédito es prueba suficiente de cualquier hecho.[114] Una cosa es no creer a un testigo; otra es exigir que una mujer víctima de violencia doméstica tenga que traer testigos adicionales que corroboren su versión antes de que el

---

[112] Sentencia del Tribunal de Primera Instancia, pág. 6.

[113] 109 D.P.R. 115 (1980).

[114] Regla 110(d) de Evidencia de 2009, 32 L.P.R.A. Ap. VI.

tribunal pueda hacer una determinación de hecho a su favor. Nuestro ordenamiento prohíbe tal proceder. Aún así, en este caso sí hubo un testigo adicional con conocimiento personal de los hechos que expresó haber presenciado actos de violencia, pues el padre de la demandante testificó que en una ocasión fue a buscar a su hija a la casa y la encontró con marcas en la cara y presenció los insultos del demandado hacia ella. A pesar de ello, el juez concluyó que los testigos manifestaron no tener conocimiento de incidente de maltrato alguno.[115]

Ante la ausencia de una determinación expresa de falta de credibilidad en cuanto al testimonio de la señora Dávila Nieves, las expresiones incorrectas del juez de instancia sobre la necesidad de corroboración y el hecho ignorado en la Sentencia de que el padre, en efecto, ofreció tal corroboración, revelan una resistencia del juez de instancia a concluir que lo relatado por la demandante amerita un remedio legal. Para el juez de instancia, lo que le ocurrió a la demandante había que echarlo al olvido. La impresión que tuvo la señora Dávila Nieves al salir de la reunión en cámara, de que el juez no le creería o no tomaría en serio sus alegaciones, fue tristemente profética. No hay en la Sentencia una sola

---

[115] Sentencia del Tribunal de Primera Instancia, pág. 6.

determinación de hecho que recoja alguno de los eventos de violencia relatados por la demandante, aunque sí hay determinaciones relacionadas con el hecho de que la señora Dávila Nieves ahora es más "madura" y que el testimonio de la madre del demandado describía a la pareja como "bien enamorada".[116]

Los errores de derecho también pueden ser producto de un ánimo prejuiciado. En ese sentido, no podemos pasar por alto que el juez de instancia concluyó, como cuestión de derecho, que nuestra decisión en *Santiago v. Ríos Alonso* no aplicaba al caso de autos, porque se requería una convicción por violencia doméstica en el ámbito penal. <u>No hay nada en esa decisión que sugiera siquiera que sea necesaria una convicción como requisito o elemento a considerarse para adjudicar una causa de acción por daños y perjuicios como consecuencia de actos de violencia doméstica</u>. Es harto conocido que la ausencia de una convicción en la esfera penal no es óbice para prevalecer en una causa de acción en un procedimiento civil. La diferencia en el estándar de la prueba requerida en ambos procesos permite una absolución en el caso criminal pero un fallo adverso en el pleito civil.

VI

Por todo lo anterior, resolvemos que, en este caso, el juez de instancia incurrió en pasión, prejuicio y

---

[116] *Véanse* las determinaciones de hechos 1, 2, 6 y 17.

parcialidad al adjudicar la controversia entre la señora Dávila Nieves y el señor Meléndez Marín. Las visiones personales del juez sobre la violencia doméstica, en particular sobre la conducta de las víctimas en esas circunstancias, le impidieron actuar de manera imparcial y desempeñar su función judicial adecuadamente. Por lo tanto, su apreciación de la prueba y sus determinaciones de hechos no son confiables. Como consecuencia, los tribunales apelativos quedamos imposibilitados de revisar adecuadamente la controversia jurídica presentada.

Ahora bien, el hecho de que un juez de instancia haya incurrido en pasión, prejuicio o parcialidad no conlleva, necesariamente, que la parte afectada deba prevalecer en su causa de acción. A fin de cuentas, un juez puede estar parcializado contra una parte que puede no tener razón. No sabemos si las alegaciones de la señora Dávila Nieves son ciertas. Lo que sabemos es que, en este caso, no podemos descansar en la adjudicación hecha por el tribunal de instancia. Por ello, corresponde devolver el caso a dicho foro para que las partes tengan su día en corte ante otro juez, uno imparcial y libre de toda pasión y prejuicio. Una vez ocurra eso y se emita el dictamen correspondiente, las partes determinarán si deben recurrir y los tribunales

apelativos estaremos en posición de ejercer nuestra función revisora.[117]

En virtud de lo anterior, revocamos la sentencia del Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia y se ordena la celebración de un nuevo juicio ante otro juez.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

---

[117] En los tribunales estadounidenses, la celebración de un nuevo juicio es el remedio más utilizado cuando, en casos civiles, la determinación del jurado sobre la cantidad a otorgarse por daños es irrazonable. Si el juez de distrito se niega a conceder el nuevo juicio, el tribunal apelativo puede ordenarlo, basándose en que la cantidad no está sustentada por la prueba presentada. *Véase* E. Schnapper, "Judges against Juries – Appellate Review of Federal Jury Verdicts", 1989 Wis. L. Rev. 237, 313-336 (1989). Recordemos que la idea de "pasión, prejuicio o parcialidad" que importamos de Estados Unidos se refería a la actuación del jurado, pero en Puerto Rico se adoptó para aplicarla a la actuación de los jueces y las juezas, y se ha desarrollado de manera diferente. Por eso, el remedio de nuevo juicio allá se refiere a que otro jurado evalúe la prueba y en Puerto Rico debe evaluarla otro juez o jueza.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Lizbeth M. Dávila Nieves
        Peticionaria

                                    *Certiorari*
                        CC-2011-534

        v.


Luis Orlando Meléndez Marín
        Recurrido



*SENTENCIA*


En San Juan, Puerto Rico a 6 de febrero de 2013.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se revoca la sentencia del Tribunal de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia y se ordena la celebración de un nuevo juicio ante otro juez.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal. El Juez Asociado señor Rivera García concurre sin opinión escrita.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo